## W. N. WILLIAMS AND OTHERS v. VILLAGE OF KENYON AND OTHERS.[1]

October 14, 1932.

Nos. 29,066, 29,067, 29,068, 29,069.

[1]Reported in 244 N. W. 558.

D. L. *Grannis*, O. B. *Strand*, *Cobb*, *Hoke*, *Benson*, *Krause & Faegre*, and *Tracy J. Peycke*, for appellants.

*Andrew Finstuen*, *Thomas Mohn*, *Horace W. Mohn*, and *Oppenheimer*, *Dickson*, *Hodgson*, *Brown & Donnelly*, for respondents.

A. *William Groth* and *Cyrus Erickson*, amici curiae, filed a brief in support of the contention of appellants.

*Kyle & Kyle*, amici curiae, filed a brief in support of the contention of respondents.

HOLT, J.

Plaintiffs appeal from the orders denying their motions for a new trial. There were four actions brought by and in behalf of taxpayers of the village of Kenyon, this state, against the village and its officers, and against certain defendants who had entered into contracts for the installation of the various units in a municipally owned and operated electric lighting and heating plant, to declare such contracts void and enjoin the defendants from performing the same. Findings were made in favor of defendants in each case. It is conceded that if the contract between the village and the Worthington Pump & Machinery Corporation, hereinafter called the Worthington company, is valid, the order in each case should be affirmed. So we need consider only the case in which the Worthington company is one of the defendants; but certain facts in connection with the plan to install the entire plant should be stated.

The village exists and operates under L. 1885, p. 148, c. 145, and amendatory acts. The electric light, power, and heat so far used by the village and its inhabitants has been furnished by the plaintiff corporation, which is also a taxpayer therein. But on August 31, 1931, the village council adopted a resolution that the village erect and operate a lighting and heating plant for supplying light and heat for public purposes and for the private use of its inhabitants, subject to the approval of the project by the voters. It was approved at an election held October 14, 1931, at which time the electors also voted to issue to the state $40,000 in bonds to pay for the power-house and the distributing system such as poles, wires, etc. Previous to the election the council had called for bids for the erection of the power-house and the distributing system; and also had called for bids for the furnishing of the generating power equipment upon the terms of a proposed conditional sales contract, whereby such equipment should be considered personal property, the title whereof should remain in the vendor until fully paid for solely from the net earnings of the plant, after deducting all expenses for operation and the accruing interest and principal instalments as these became due on the $40,000 bonds mentioned. The village was not to assume any obligation to pay any part of the purchase price. Certificates were to be issued stating the time and manner of payment from the net earnings; but such certificates were to show on their face that the village was not to pay them and that they were payable solely from the net income as stated. The bid of the Worthington company of $67,952 for the Diesel engine and generating equipment was accepted, and a conditional sales contract executed with some modification of the terms of the proposal. The call for bids was conditioned upon the election being in favor of the construction of the whole plant and in favor of a bond issue to pay for the power-house and the distributing system; and the acceptance of all three bids was conditioned upon contracts being executed for all three jobs. So when later the electors voted to construct and operate the plant and issue bonds, they had before them the call for bids and understood how the acquisition of the generating equipment was to be had.

The first proposition of appellants is that there is no power in the village to enter into a conditional sales contract for the generating equipment. A village has such powers only as the legislature delegates. And the powers delegated are construed rather strictly. Long v. City of Duluth, 49 Minn. 280, 51 N. W. 913, 32 A. S. R. 547. However, where power is granted for a designated object, it implies the use of such powers and means as may be reasonably necessary to attain the object.

Said L. 1885, p. 148, c. 145, in § 9 thereof, declares a village organized thereunder shall "be endowed with all the rights, powers and duties incident to municipal corporations at common law * * * capable of contracting and being contracted with, * * * and shall have power to take, hold, purchase, lease and convey real estate or personal property, or mixed estate as the purposes of the corporation may require," etc.

Among the powers of municipal corporations at common law, 1 McQuillin, Mun. Corp. (2 ed.) § 124, mentions:

"1. To have perpetual succession.

"2. To sue and be sued, implead and be impleaded, grant or receive by its corporate name and do all other acts as natural persons may," etc.

Conditional sales contracts are entered into by natural persons and are in common use. Nothing in the statutes so far quoted prohibits the village from using such contracts in dealing with personal property. The contract relates to proprietary powers of the village. Reed v. City of Anoka, 85 Minn. 294, 88 N. W. 981. We must therefore examine other statutory provisions which restrict or limit those of L. 1885, p. 148, c. 145, § 9.

G. S. 1923 (1 Mason, 1927) § 1229, expressly empowers a village, under whatever law governed, to erect lighting and heating plants for both public purposes and private use of its inhabitants, 'and to fix and collect uniform charges for private supply, or to purchase or lease any such works. "But no such erection, purchase, or lease shall be made without approval by the voters of the village, such

as is required by law for the issuing of village bonds for like objects. The proposal so to do, and a proposal to issue bonds to raise money therefor, may be submitted either separately, or as a single question."

No contention is here made that the electors did not approve the construction of the distributing system or the power-house, and the $40,000 bond issue to the state so as to be able therewith to pay for that part of the plant. But the claim is that the $67,952 generating equipment, without which the distributing system and the power-house are useless, cannot be acquired under this conditional sales contract because the village lacks power to make it, and its terms are such that it prevents the village from properly exercising its functions.

We think what has been said above shows that since the power to acquire such a plant is expressly conferred, the means of accomplishing that object is left to the village as long as these are such as are customary and reasonable. It cannot be concluded because of the last quoted sentence of § 1229 that the only way to acquire a plant is by a bond issue. If the village has the cash or some other property to give in trade or someone should wish to donate a plant, it could not be said that said § 1229 stands in the way. That the terms of the conditional sales contract interfere with the free exercise of the function of the village and the performance by the treasurer of his prescribed duties seems to be equally untenable. It cannot be successfully argued that the period within which payment is to be made necessarily extends longer than the period for which bonds may issue, were that method adopted. The village is not bound to maintain any certain rates. The provision as to that subject is for benefit of the village, so that the Worthington company may not demand that rates be increased above those now existing should the future net earnings fall below expectations. There is nothing in the contract which binds the village to continue to operate the plant. The electors knew when they voted for the construction of the plant that the plan was to acquire the generating equipment by means of a conditional sales

contract. There is nothing in that contract which obligates the village to pay any part of the purchase price or to devote a penny of the money raised by taxation to pay for the generating equipment. Not only that, the Worthington company receives nothing of the earnings of the plant—the village property and the company's property—until all accrued interest and instalments of the $40,000 bond issue have been first paid out of the net earnings. In that situation it seems idle to contend that the village stands to lose any of the earnings coming from the distributing equipment or power-house, for more than the proportionate part therefrom goes in payment of the bond issue used to pay for that property. Nor do we apprehend that the village treasurer will find that in paying out the net earnings as provided in this conditional sales contract he cannot comply with L. 1885, p. 148, c. 145, § 19. We think all of the arguments here pressed are convincingly met and answered in favor of defendants in Lang v. City of Cavalier, 59 N. D. 75, 228 N. W. 819. See also Maffit v. City of Decatur, 322 Ill. 82, 152 N. E. 602; City of Bowling Green v. Kirby, 220 Ky. 839, 295 S. W. 1004; Barnes v. Lehi City, 74 Utah, 321, 279 P. 878. There are authorities to the contrary. Miller v. City of Buhl, 48 Idaho, 668, 284 P. 843, 72 A. L. R. 682; Christensen v. Town of Kimballton, 212 Iowa, 384, 233 N. W. 789, 236 N. W. 406; Zachary v. City of Wagoner, 146 Okl. 268, 292 P. 345; Lesser v. Warren Borough, 237 Pa. 501, 85 A. 839, 43 L.R.A.(N.S.) 839; Hesse v. City of Watertown, 57 S. D. 325, 232 N. W. 53. City of Campbell v. Arkansas-Missouri P. Co. (C. C. A.) 55 F. (2d) 560, adopts the ruling of the Missouri court in Hight v. City of Harrisonville, 328 Mo. 549, 41 S. W. (2d) 155, holding that where it appeared that the city was to pay a rate from tax money for the electricity used by it to produce the fund which was to pay the conditional sales contract, the fund was derived in part from taxation and it represented an obligation of the municipality. But in Bell v. City of Fayette, 325 Mo. 75, 28 S. W. (2d) 356, a contract more like the one before us was held within the power of the municipality and did not affect its debt limit. It is further the contention of appellants that the court should infer that villages do not have the power to

make use of conditional sales contracts from the fact that rather extensive powers have been given cities in regard to property dealings (G. S. 1923 [1 Mason, 1927] §§ 1314-1317 and §§ 1484-1490). It is enough to say that the statutes referred to do not embrace such conditional sales contracts as the one before us.

The second contention is that the obligation arising out of the conditional sales contract creates an indebtedness of the village and runs counter to 1 Mason, 1927, § 1938-3, and to c. 10 of said code in which the section is found. As we read that chapter, neither the $40,000 bond issue nor this contract are within any of its provisions. Certainly they are excluded by § 1938-3 (D). It is claimed that the certificates to be issued under the sales contract create some sort of obligation. The only duty or obligation of the village that can be read into the certificates is to distribute the net earnings as therein stipulated. But this in no manner requires the village to pay any sum whatever upon the sales contract or to devote any money derived from taxes to pay the certificates. We lately held that sewer warrants, not showing so plainly on their face as the certificates to be issued under this sales contract that they were not the obligations of the maker, did not carry an obligation of the municipality to pay. Leslie v. City of White Bear Lake, 186 Minn. 543, 243 N. W. 786. In other jurisdictions it has been held that if there is no obligation on the part of the municipality in a conditional sales contract to pay the purchase price, or to use any part of its taxes or income to pay therefor, but merely to apply the net earnings of the property named in the contract upon the purchase price thereof, then no debt of the municipality is created or incurred which might affect the constitutional or statutory debt limit fixed. In addition to the cases hereinbefore cited, we name: Shelton v. City of Los Angeles, 206 Cal. 544, 275 P. 421; Searle v. Town of Haxtun, 84 Colo. 494, 271 P. 629; Ward v. City of Chicago, 342 Ill. 167, 173 N. E. 810; Fox v. City of Bicknell, 193 Ind. 537, 141 N. E. 222; Jones v. City of Corbin, 227 Ky. 674, 13 S. W. (2d) 1013; Kasch v. Miller, 104 Ohio St. 281, 135 N. E. 813; Butler v. City of Ashland, 113 Or. 174, 232 P. 655; Twichell v. City of Seattle,

106 Wash. 32, 179 P. 127; State ex rel. Morgan v. City of Portage, 174 Wis. 588, 184 N. W. 376. There is here no suggestion that the village made use of the conditional sales contract in order to evade the debt limit.

Appellants cite Garrett v. Swanton, 216 Cal. 220, 229, 13 P. (2) 725, 729. It approves the law as stated in Shelton v. City of Los Angeles, 206 Cal. 544, 275 P. 421, but points out that, in the case in hand, the city of Santa Cruz had paid out of public funds $30,000, or nearly one-fifth of the whole purchase price of the pumping outfit to be installed in the water system plant, already owned by the city and for which it was bonded in over half a million of dollars, and that the balance of the purchase price was to be paid from the earnings of the whole system; and the court, concluding that these earnings could not be considered "a special fund," said:

"Thus it is well established that an indebtedness or liability is incurred when by the terms of the transaction a municipality is obligated directly or indirectly to feed the special fund from general or other revenues in addition to those arising solely from the specific improvement contemplated. It also seems to be well settled, as a second limitation to the doctrine, that a municipality incurs an indebtedness or liability when by the terms of the transaction the municipality may suffer a loss if the special fund is insufficient to pay the obligation incurred."

Here there is no obligation of the village to feed the fund. In fact, the fund must first be used to meet the payments of the bonds which procured part of the plant, and then what remains is to be applied on the conditional sales contract. We are satisfied that out of the transaction evidenced by the conditional sales contract no indebtedness of the village was created which can figure as an indebtedness under 1 Mason, 1927, c. 10.

The orders are affirmed.