JOSEPH DAVIES AND ANOTHER v. VILLAGE OF MADELIA
AND ANOTHER.[1]

June 30, 1939.

No. 32,130.

1Reported in 287 N. W. 1.

*Somsen, Dempsey, Johnson & Somsen, C. J. Manahan, Joseph R. Harmon,* and *Kenneth L. Karr,* for appellants.

*Farmer & Tighe* and *Paul V. Fling,* for respondent Village of Madelia.

*Kyle & Kyle,* for respondent Fairbanks, Morse & Company.

528

GALLAGHER, CHIEF JUSTICE.

Action by two taxpayers of the village of Madelia to restrain performance of and to set aside a contract between the village of Madelia and Fairbanks, Morse & Company for the construction of a light, heat, and power plant. Findings of fact and conclusions of law were made in favor of the defendants. Plaintiffs appeal from an order denying their motion for amended findings and conclusions or for a new trial.

Plaintiff Interstate Power Company supplied the village of Madelia and its inhabitants with electricity under a franchise which expired September 22, 1938. Early in 1937 and prior to the expiration date of the franchise, the council and citizens of the village began to consider the advisability of establishing a municipal light, heat, and power plant. Members of the council and representatives of civic groups visited cities and villages in the surrounding area having municipally owned plants and investigated the methods of financing employed in such plants. An engineering firm was hired by the council to make a survey and estimate of the cost of a plant to meet the requirements of the village. On June 1, 1937, the council adopted a resolution to the effect that the village should erect and operate a heat, light, and power plant, subject to the approval of the voters. The engineers were instructed to prepare plans and specifications, which were subsequently adopted by the council. In August, 1937, before the voters had yet given their approval, the council advertised for separate bids on the proposed power plant, distributing system, and generating equipment.

According to the specifications, the first two units were to be paid for by a general bond issue while the cost of the latter was to be met out of the net earnings. Several bids were received, but none were on the distributing system. After consideration, the council rejected all bids. In April, 1938, the engineers were instructed to amend the plans and specifications so as to provide for the construction of the entire undertaking by a single bidder to be paid out of the net earnings. When this, by the adoption of proper resolutions, was accomplished, bids were requested by advertisement; subject to the outcome of the election. Three contractors submitted

bids, which were opened July 19, 1938. They were (1) Power Service Corporation, $145,800; (2) Fairbanks, Morse & Company, $139,952; and (3) L. A. Kepp Contracting Company, $145,000. Subject to the election, the contract was awarded to Fairbanks, Morse & Company (hereinafter referred to as company). On August 16, 1938, the election was held and resulted in the requisite number of votes being cast in favor of the proposal. Plaintiffs seek to prevent defendants from proceeding with the project authorized by the election. They assail the contract upon a variety of grounds and assign a large number of alleged errors.

■ First is the contention that the contract cannot stand because, prior to the adoption of the plans and specifications, the village officers and representatives of the company colluded and conspired so that the plans and specifications were made advantageous and acceptable to the company to the disadvantage of other bidders, thereby bestowing on Fairbanks, Morse & Company an unfair and illegal advantage and fettering competition. Plaintiffs point out that agents of the company attended village meetings and discussed the subject of a municipal plant, making various suggestions and proposals during the course of the meeting. It is argued that the most friendly relationship existed between the council and the company and that many of the proposals made by the latter were adopted by the council as the result of collusion and fraud.

The record does not sustain that contention. The meetings at which the representatives of the company appeared were public. Representatives of civic groups attended. The attorney for plaintiff Interstate Power Company was present and on some occasions took active part in the discussion. The company's agents were not the only representatives of business organizations who attended. Other contractors, such as the Worthington Pump & Machine Company and the L. A. Kepp Contracting Company, had representatives who were present and active when consideration of the plant was before the council. The testimony shows that agents for plaintiff Interstate Power Company appeared at several meetings in an effort to obtain a renewal of the power franchise. Councilman Hillesheim testified that "they appeared before us at several meet-

ings, almost one meeting after the other." The trial court found that before the election "the question to be submitted thereat was a matter of general discussion in said village; that a campaign for and against the question of establishing a municipal light, heat, and power plant was waged."

We do not find any evidence upon which a finding that there was a preconceived plan to accept the company's proposals could stand. Nor do we think that the conduct of the company's agents was any different in substance than that of the other contractors' representatives or, in fact, those of plaintiff Interstate Power Company. Plaintiffs place reliance upon the fact that two of the village councilmen visited the St. Paul offices of the company during the determinative period and discussed the proposed plant. One of the councilmen testified the purpose of the visit was to find if the company would bid on a "turnkey" job. We quote from his testimony (Dr. James):

Q. "You knew if they did bid on that sort of a job the plans and specifications would have to be changed, did you not?

A. "No.

Q. "You didn't know that?

A. "Didn't have to be changed except the method of payment out of revenue.

Q. "Isn't that an important change?

A. "Yes.

Q. "Isn't it true also they would have to be changed so as to provide the bidders could bid only upon the entire job and not upon the separate portions of it?

A. "Yes. * * *

Q. "You knew also you would have to make the changes, that Fairbanks, Morse & Company would demand those changes if they bid on a turnkey job?

A. "Yes."

This evidence does not go further than to show that the councilmen were willing to make a change in the plans in order to get as a possible bidder an organization experienced in the work of this

character and financially able to undertake it on the basis desired by the village. It does not establish fraud or collusion. There is no showing that anything improper took place at the St. Paul meeting. The conduct of the councilmen may have been unwise, but it has not been shown to be a fraud on the village.

■ The council should not and need not be deprived of the knowl-edge and experience of those familiar with matters relating to municipal power plants merely because they represent a possible bidder. What the law demands is that the council preserve its right of independent action. There has been nothing adduced by plaintiffs which shows that the council was not free at all times to reject suggestions and proposals made in the meetings by various representatives when it deemed them not to be to the best interests of the community. Likewise others, including citizens of the village and representatives of other contractors, could and did controvert the proposals of the company. So long as the council acted freely and independently and for what it properly deemed to be the best interest of the community, the mere fact that it incorporated into the plans and specifications proposals argued for and advanced by possible bidders is not ground to set aside the contract when the plans, as adopted, do not in fact unreasonably or unlawfully limit competition. A municipal council has the right to determine, within reasonable limits, the manner and method of accomplishing an object within the scope of its powers. 4 Dunnell, Minn. Dig. (2 ed.) § 6697. The village electorate appears to have taken an active interest in the entire affair, and subsequent to the making of the contract (subject to the outcome of the vote), based upon the plans and specifications adopted by the council, they voted to erect and maintain the plant. The findings below on this question are amply sustained by the evidence, and we shall not disturb them.

■ Several assignments can be grouped into the single claim that the plans and specifications for the plant are indefinite, uncertain, and contradictory so that no definite standard existed upon which the bidders could calculate or the village council compare. This, it is urged, stifled competition.

Reason alone sustains the view that "where competitive bidding is required by law, the specifications inviting bids must be sufficiently definite and precise to afford a basis therefor, and free from restrictions, the effect of which would be to stifle competition." 44 C. J. p. 104, § 2191; 3 McQuillin, Mun. Corp. (2 ed.) p. 891, § 1313. In each instance here under consideration the question whether or not the plans and specifications violate this principle resolves itself into a question of degree and fact. The trial court found the specifications were lawful, reasonable, and proper and that they did not prevent competition.

The map upon which the distributing system was planned showed that it embraced plans for a system beyond the corporate limits of Madelia. Five hundred and ten services were to be included in the bid, and plaintiffs argue that this is the exact amount needed and designated as within and without the corporate limits. Four hundred and seventy-nine of these were in the village of Madelia and 31 outside the village. In the legend on the map were the words: "Bidders to bid on lines within corp. limits only." It is asserted that because of this the plans are contradictory and presented confusion to the bidders. In this we cannot concur. The legend is decisive and clear. The bidders had the duty to read and comply with it. It specified definitely the extent to which bidders were to estimate. Defendants' engineer testified that the purpose of calling for more services than were actually needed within the corporate limits was to allow for a margin of growth since the work would entail more than a year's time. It may have been only coincidental that the number called for by the specifications and plans was the same as the number within and without the corporate limits. In any event, the finding below being adverse to plaintiffs and sustained by the evidence, we are not free to alter it. The same disposition is made of the similar contentions with respect to the meters and poles. The plans were adequately definitive.

■ Next is the contention that the council prevented free play of competition by making illegal, unfair, and unreasonable specifications for the work. The first provision in this category is the one calling for the payment of the entire plant out of the net earn-

ings. A second provision so catalogued by plaintiffs is that requiring the bid to be for the entire plant, generator and distributing system rather than for separate units. The argument is that by inserting such provisions those who could bid if a cash or bond basis were adopted were eliminated along with those who could bid on a separate unit but who were not able to undertake the entire construction. The finding below was that the specifications were reasonable, within the discretion of the council, and did not in fact prevent competition.

The controlling principle in cases of this nature is aptly stated in Williams v. Village of Kenyon, 187 Minn. 161, 165, 244 N. W. 558, 560, wherein it was said: "Since the power to acquire such a plant is expressly conferred, the means of accomplishing that object is left to the village as long as these are such as are customary and reasonable." Again: "Where municipal authorities are authorized to contract in relation to a particular matter, they have a discretion as to methods and terms, with the honest and reasonable exercise of which a court cannot interfere, though they may not have chosen the best method, or made the most advantageous contract." 4 Dunnell, Minn. Dig. (2 ed.) § 6697.

There is no affirmative evidence which satisfactorily establishes that the requirements actually placed an unreasonable limitation on competition. The council, of necessity, is vested with discretion in the matter so that the interests of the community can be harmonized with the demand for free competition. Logically, if the plaintiffs' argument is sound, the specifications should likewise be offensive even if they called for bids on each unit inasmuch as there are likewise many who could bid on less than a unit but not upon a whole unit in the undertaking. There is nothing unreasonable under the facts presented in demanding that one contractor submit a bid upon the entire work. In fact, the actual result was that three submitted bids on such a basis. The council had the right and the power to make such a requirement. If the entire installation was to be paid for out of earnings, the contract could not well be let to more than one bidder.

The method of financing selected by the council was within its power. Payment out of net earnings has a great many advantages to the village and is not an uncommon method of financing municipal power plants. Williams v. Village of Kenyon, 187 Minn. 161, 244 N. W. 558. The method of payment selected appears to have been chosen according to what the council believed to be for the best interest of the village. It has not been established that it was adopted for the purpose of limiting competition. The means selected were not unreasonable, and the trial court's finding in this respect must be approved.

Having determined that the council had the power to specify as it did, the contention that the method was improvident and wasteful does not need discussion. It has not been shown that the limits imposed by law in this respect were exceeded. Rather it amounts only to a disagreement with the judgment exercised by the councilmen.

■ There is also the claim that the specifications failed to designate the number and time of payments and the interest on the obligation except to specify that no payment on principal or interest should be required before 180 days after commencement of operation, and therefore that the contract is a nullity. The basis of the contention is that there was no definite standard upon which the bidders could compete. In this respect the provisions might well have been more definite. We have examined the record, however, and cannot see how any real prejudice resulted to anyone. There was not such a spread in the payments and interest called for by the various bidders as to indicate that any serious difficulty was encountered. The council by the use of elementary mathematics and common sense could easily make a rational comparison. The method was convenient from the point of view of the village. We do not think there is ground to invalidate the entire proceeding because of this element in the situation. In Robinson v. City of Saginaw, 267 Mich. 557, 255 N. W. 396, it was held that a sufficient standard was established although the length of the period of guaranty was left to the individual bidder to determine.

■ Because various resolutions dealing with matters relative to the letter of the contract and the holding of the election were not signed by the president of the village council, attested by the clerk, and thereafter published, we are urged that the invalidity of the contract is established. Reliance is placed upon 1 Mason Minn. St. 1927, §§ 1196 and 1197. They require all ordinances, rules, and by-laws to be signed by the president and attested by the clerk and published in a newspaper in the county. The sections do not mention "resolutions" and by their terms do not purport to include them. In fact other sections of our statutes, 3 Mason Minn. St. 1938 Supp. §§ 1197-1 and 1197-2, specifically deal with resolutions but do not require that formalities similar to those required for an ordinance, rule, or by-law be met. We have not been referred to any other section of our statutes which requires a resolution to be signed, attested, and published, and we do not think it comes within the mandate of 1 Mason Minn. St. 1927, §§ 1196, 1197.

Summary disposition can be made of the argument that the plans and specifications unlawfully provide that the distribution system shall extend beyond the corporate limits of the village notwithstanding the fact that the question of extending the lines beyond these limits was not submitted to the voters pursuant to 3 Mason Minn. St. 1938 Supp. § 1867-1. By the legend on the map bidders were instructed to bid on the lines within the corporate limits only. The specifications called for a plant "in and for the said village" of Madelia. The notice to bidders and the contract both contained the same statement. We find nothing to lead to the conclusion that the village unlawfully embarked on extra-corporate distribution.

■ Likewise we see nothing illegal in § 20a of the specifications, which provides that any excess in earnings shall be used only for extensions and additions to the plant and that the earnings from such shall be paid into the fund designated for payment of the original plant. By § 20(b) the owner can pledge the excess earnings for the payment of the extensions and additions. The provision is not unreasonable. The additions and extensions paid for out of the excess earnings of the original plant are the result of its operation and existence. It is to the advantage of the village to

get the original plant paid for. It is still free to make additions and extensions out of other funds and use the earnings therefrom as it sees fit. It is only when the excess earnings are employed that the limitation comes into operation. This being true, there is a sufficient relation between the original plant and the additions to justify using the earnings from the latter to pay off the former. Likewise we do not think the provision unreasonably ties the hands of the council with respect to additions and extensions.

■ Errors are assigned on the ground that the trial court erroneously sustained defendants' objections to the calling by plaintiffs of Mr. Paul V. Fling, the Madelia village attorney, for cross-examination under the statute, 2 Mason Minn. St. 1927, § 9816, and erroneously refused an offer of proof to show by Mr. Fling that among other things the company made proposals which were adopted in some instances over his objections. The basis of the ruling was that the village attorney was not such an officer that he could be called under the statute and that the facts contained in the offer of proof were immaterial. We need not determine whether a municipal officer can be called under the statute or if the village attorney is a municipal officer for the reason that we have been unable to find any prejudice by the ruling even if we assume (but do not decide) it was erroneous. The crux of the offer was to show activity on the part of the company's representatives in the framing of the specifications and that debates took place between the company's attorney and Mr. Fling, particularly with respect to the rights of the successful bidder in case of default by the village. All the events offered to be established occurred at a public meeting. The testimony sought to be elicited from Mr. Fling was substantially adduced from other witnesses and does not seem to be in serious dispute. We find no prejudice and no grounds for reversal.

Other assignments of error have been considered and are either adequately disposed of in our prior cases or do not merit further extension of this opinion. The order appealed from should be and hereby is affirmed.

Mr. Justice Hilton, being incapacitated by illness, took no part.