# OTTER TAIL POWER COMPANY AND OTHERS v. VILLAGE OF ELBOW LAKE AND OTHERS.[1]

June 22, 1951.

No. 35,560.

[1]Reported in 49 N. W. (2d) 197.

*Field, Field & Arvesen,* for appellants.

*Swanson Brothers,* for respondents Village of Elbow Lake and the members of its council.

*Ryan, Ryan, Ryan & Ebert,* for respondent General Engineering Corporation.

*Briggs, Gilbert, Morton, Kyle & Macartney,* for respondents Fairbanks, Morse & Company and W. G. Peterson.

KNUTSON, JUSTICE.

The village of Elbow Lake is organized under the general statutes of this state. For many years, plaintiff Otter Tail Power Company has furnished electricity to the village and its inhabitants under a nonexclusive franchise. For some years prior to the holding of the election hereinafter mentioned, there had been talk of constructing a municipally owned and operated power plant. The members of the council and members of the civic and commerce club had investigated other plants. In June 1949, the village employed defendant General Engineering Corporation to make a preliminary survey and report with reference to the electric needs of the village and the estimated cost of such a plant. The survey was submitted to the village council on July 14, 1949. On August 15, the council adopted a resolution determining that it was necessary and expedient and for the best interests of the village and its inhabitants to construct a plant at a total estimated cost of not to exceed $280,000 and to raise the money therefor by the issuance of revenue certificates payable solely from the revenues of the plant and system. Approval of the voters of the village was sought at a special election held on September 2, 1949. The following question was submitted to the voters:

"Shall the Village of Elbow Lake construct a plant and system for the generation and distribution of electricity for light, heat and power at a total estimated cost of $280,000.00 and raise money therefor by the issuance of revenue certificates payable solely from the revenues of the plant and system?"

The vote of the people was favorable, 452 votes being cast in favor of the proposition and 130 against.

Thereafter, the village council directed its engineer to prepare plans and specifications, and after these had been approved the village proceeded to advertise for bids. The plans and specifications were divided into five divisions. Division I covered general conditions applicable to all other divisions; division II covered the construction of the power plant building; division III covered the construction of the electric distribution system; division IV covered the purchase of watt-hour meters; and division V the purchase and installation of the diesel engine equipment. Contracts awarded to successful bidders for the construction of the plant building and the distribution system have not been questioned, so they will not be referred to further herein.

Six bids were received for the furnishing of the watt-hour meters. The concerns so bidding, the make of the meter to be furnished, and the total price bid were as follows:

| | | |
|---|---|---|
| Duncan Electric Manufacturing Company | Duncan meter | $8,239.82 |
| General Electric Supply Corporation | General Electric meter | 8,096.49 |
| Graybar Electric Company, Inc. | General Electric meter | 8,373.00 |
| Westinghouse Electric Supply Company | Westinghouse meter | 8,197.61 |
| Bergstrom-Verbarg Company | Sangamo meter | 7,830.37 |
| Northland Electric Supply Company | Sangamo meter | 8,308.80 |

The bid of the Duncan Electric Manufacturing Company was accepted.

Only one bid was received covering the furnishing and installation of the diesel engine generating equipment, that of defendant Fairbanks, Morse & Company. That concern submitted two alternative bids, and the village council accepted the higher of the two, the total amount of which was $152,954.50.

On April 24, 1950, the village, by resolution, determined that it was necessary to provide money for the construction, equipping, and operation of the electric plant and system by the issuance of revenue certificates in the amount of $275,000, payable solely out of the revenues derived from the operation of the plant and system, and directed the village clerk to advertise for bids for the sale of such certificates.

Thereafter and before any such certificates were sold, this action was commenced by Otter Tail Power Company, in its own behalf and as a taxpayer of the village, and by Arthur Anderson, Carl Lohse, and Oscar Setterlund as residents, voters, citizens, and taxpayers of the village, in their own behalf and in behalf of all others similarly situated, praying for an injunction to enjoin the village from constructing the plant or selling the revenue certificates. Thereupon, the sale of the certificates and further proceedings were temporarily enjoined.

The trial court found in favor of defendants. From a judgment entered pursuant to findings of fact, conclusions of law, and order for judgment, this appeal has been perfected.

Plaintiffs assign numerous errors, but they have been argued under four separate propositions, which we believe raise the issues involved in this appeal. They are (1) that the bid of Duncan Electric Manufacturing Company was not the lowest responsible bid for watt-hour meters; (2) that the specifications are so vague and indefinite in some respects and so restrictive in others as to preclude competitive bidding; (3) that the village lacked authority to accept the single bid of Fairbanks, Morse & Company for a diesel engine generating plant under M. S. A. 471.34; and (4) that the

bonds are not so drawn as to be payable solely out of the revenues of the plant and system.

■ Plaintiffs first contend that the bid of Duncan Electric Manufacturing Company covering the purchase of meters was not the lowest responsible bid and that it is mandatory under § 412.311 that the contract be let to the lowest responsible bidder. This section, so far as here material, reads:

"* * * Every contract for the purchase of merchandise, materials or equipment or for any kind of construction work undertaken by the village which requires an expenditure of $500 or more shall be let to the lowest responsible bidder, after ten days' public notice."

If the village, in determining who is the lowest responsible bidder, is limited to a consideration of price alone, it is obvious from a comparison of the bids submitted that the bid of the Duncan company is not the lowest. After the bids had been submitted, the council, at an adjourned meeting, gave the representatives of each bidder an opportunity to appear with samples of their meters. The meters were demonstrated to the members of the council, and thereafter the council concluded that the Duncan meter was the one most suitable for its use, largely on account of the fact that it could more easily be taken apart and repaired.

Where more than one bid is received from a responsible bidder on the same piece of equipment or equipment of the same kind, the council has no discretion but to accept the low bid. For instance, as between the two bidders on General Electric meters or the two on Sangamo meters (assuming that both had been legal bids), the council could not accept the high over the low legal bid. But where bids are requested on equipment that is not subject to exact specifications, the council must be allowed some latitude in considering not only the price but the suitability of the article for the use for which it is intended. 10 McQuillin, Municipal Corporations (3 ed.) § 29.75, states the rule thus:

"Where the thing sought to be purchased or contracted for is not entirely subject to exact specification, as where there are a

number of different kinds in the market all meeting the requirements to a greater or less degree, the officers should consider the quality and utility of the thing offered, and its adaptability to the purpose for which it is required. In determining the question as to who is the lowest bidder, the quality of the commodity to be furnished, as well as the price therefor, is to be taken into consideration, and a bid which is low in point of price may be rejected if the material to be furnished is not the best."

In West v. City of Oakland, 30 Cal. App. 556, 560, 159 P. 202, 204, the California court said:

"* * * The term 'lowest responsible bidder' has been held to mean the lowest bidder whose offer best responds in quality, fitness, and capacity to the particular requirements of the proposed work; and that where by the use of these terms the council has been invested with discretionary power as to which is the lowest responsible bidder, having regard to the quality and adaptability of the material or article to the particular requirements of its use, such discretion will not be interfered with by the courts in the absence of direct averments and proof of fraud."

That case was followed in the later case of Hodgeman v. City of San Diego, 53 Cal. App. (2d) 610, 128 P. (2d) 412. See, also, Brener v. Philadelphia, 305 Pa. 182, 157 A. 466.

Plaintiffs place great reliance upon Coller v. City of St. Paul, 223 Minn. 376, 26 N. W. (2d) 835. The question involved in the case now before us was not involved in the Coller case. There, we dealt with the power of the city to accept a bid which did not conform to the specifications. We did hold that the city had no alternative but to accept the lowest responsible bid, but we did not hold that in determining who was the lowest responsible bidder the bid price alone was all that could be considered. We now hold that, where bids are received on items of equipment which are not capable of precise or exact specifications, a municipality may exercise a reasonable discretion in determining who is the lowest responsible bidder and, in so doing, may consider, in addition to the bid price;

the quality, suitability, and adaptability of the article to be purchased for the use for which it is intended. In so doing, the discretion exercised must be reasonable and must be based upon some substantial difference in quality or adaptability. To hold otherwise would compel a municipality to purchase an article of less value for its use simply because the price was lower. Value is not always determined by price alone. Here, the court has found that the village accepted the lowest responsible bid, and we believe that there is ample evidence to sustain that finding; consequently, that it must stand.

■ The next contention of plaintiffs is (1) that the specifications are so vague and indefinite as to stifle competitive bidding, and (2) that the specifications are so restrictive as to preclude competitive bidding.

The specifications call for bids on three engine units of not less than 1,200 horsepower. The contention is that, there being a floor but no ceiling, there is no common basis upon which bids may be considered, and also that, there being no specifications as to size of the three units, there would be no basis for comparing bids.

The court has found that the plans and specifications were sufficiently definite and precise to afford a basis for competitive bidding. Witnesses for the respective parties differed as to the range above the minimum of 1,200 horsepower which would be reasonable. They all admitted that some range would be reasonable. The question was one of fact, and the evidence sustains the court's finding.

The same is true of the claim that the specifications are so restrictive as to preclude competitive bidding. We have carefully examined the specifications and the evidence relating to this contention, and, while only one bid was submitted for the diesel engine equipment, the evidence clearly shows that several concerns could have met the specifications had they desired to do so. The fact that they could not meet a competitive price does not make the specifications too restrictive to permit competitive bidding. In purchasing equipment of this kind, the municipality must be allowed a reasonable latitude in determining what type of equip-

ment will best suit its needs. It is not necessary for the municipality so to prepare its specifications that every manufacturer of the type of equipment can meet the competitive price of every other manufacturer. Furthermore, division I of the specifications, dealing with general conditions applicable to all other divisions, contains the following provision:

"22. Substitutions

"Although some parts of the drawings and specifications may be in accordance with some manufacturer's equipment, it is not the true intent of the drawings and specifications, or is it intended to favor or protect any one manufacturer, and the Contractor is at liberty to submit to the Engineer, for approval, various makes of equipment with a change in design from that shown on the drawings."

There is nothing in the evidence to show that any prospective bidder submitted to the engineer any proposed substitution or change in the type of equipment specified. We do not believe that it would serve any useful purpose to set forth in detail the evidence on this phase of the case. It is enough to say that the trial court's finding that the plans and specifications were so designed as to permit free and unrestricted competition is supported by the evidence. What we said in Ahlquist v. Commonwealth Elec. Co. 194 Minn. 598, 605, 261 N. W. 452, 455, is applicable here:

"* * * Whether the specifications for the Diesel engines were so drawn as to exclude free and unrestricted bidding was a pure issue of fact. The trial court found upon ample evidence this charge unproved and not true. No manufacturer or seller of Diesel engines was called to testify that the specifications were such that he could not bid. Plaintiffs' expert admitted that any manufacturer of Diesel engines could supply engines according to the specifications, but maintained that it would cost more to do so than it would cost those whose equipment was better suited to build the engines specified."

■ Plaintiffs next contend that, inasmuch as there was only one bid submitted for the diesel engine generating equipment, the village lacked authority to accept such bid because of §§ 471.34 to 471.37. Section 471.34 reads as follows:

"When any county, town, city, borough, village, or school district in this state calls for bids for the purchase of any supplies or equipment, no bid submitted shall be accepted unless competitive bids have also been submitted."

The specifications respecting bids for the diesel equipment require the successful bidder to furnish "all material, equipment, and work required for the installation complete in place ready to operate of the engine generator with exciter units, auxiliary equipment, piping, heating, plumbing, switchboard, station wiring, etc., as shown on the plans and outlined in this Division V of the specifications."

The form of bidding proposal, constituting a part of the specifications, which bidders were required to use in submitting their bids, included the following:

"* * * hereby offers to furnish all labor, material, skill, tools, machinery, supplies and equipment of every kind, and all other instrumentalities necessary to construct, and to construct and install, the said Diesel engine generating equipment and auxiliaries, all in accordance with the Plans and Divisions I and V of the Specifications * * *."

It is apparent from an examination of the detailed plans and specifications that bids submitted on division V involved a great deal more than the furnishing of supplies and equipment. It would serve no useful purpose to state in detail the labor and services included in the bid. Reference to subdivision headings will suffice to show that much labor and services were involved in addition to the furnishing of the actual equipment. Section 1 of division V deals with engines, generators, and exciters and specifies the requirements thereof. Section 2 deals with the furnishing and *in-*

*stallation* of auxiliary equipment such as water pumps, cooling system, air compressor, oil storage tank, oil filters, water softener, oil gauges, piping, oil meters, and many other items. Section 3 deals with switchboard installation; paragraph 2 thereof deals with material and *workmanship*. Section 4 deals with station wiring; paragraph 1 thereof is entitled "WORK TO BE DONE," and paragraph 2 "CONDUIT WORK." Section 5 deals with heating and ventilating installation; paragraph 1 thereof covers "SCOPE OF THE WORK." Section 6 deals with plumbing installation. Here, again, paragraph 1 deals with workmanship, and paragraph 2 with "SCOPE OF THE WORK." Section 7 deals with painting of machinery, foundations, bases, piping, etc.

It is significant to note that M. S. A. 412.311, which is the general statute covering the requirements of the village in accepting bids, deals both with the purchase of merchandise, materials, or equipment, *or* for any kind of construction work undertaken by the village, and requires the village to let upon bids to the lowest responsible bidder the contract for either the purchase of merchandise, materials, or equipment, or for any construction work requiring an expenditure of $500 or more. Section 471.34, on the other hand, deals only with bids for the purchase of supplies and equipment and is entirely silent on the question of bids for work. It seems apparent, therefore, that § 471.34 was not intended to cover bids for work, labor, or services. The statute is restrictive and should not be extended beyond the language used in it. The attorney general has held on numerous occasions that § 471.34 does not cover work or labor or the purchase of equipment which includes the installation thereof involving work or labor,[2] and the judges of two of our district courts have placed the same construction upon the statute.[3] The opinions of the attorney general are entitled to

[2]Report Attorney General, 1938, No. 38; *Id.* No. 122; Opinion Attorney General, No. 707-A, May 25, 1939; *Id.* No. 707-A-1, October 27, 1939; *Id.* No. 707-A-1, September 23, 1949.

[3]Breiland v. Village of Halstad, Fourteenth Judicial District, Judge Montague; Eastern Minnesota Power Corp. v. Village of North Branch,

considerable weight, after having been acted upon now for many years. We believe the proper construction of § 471.34 is that it covers only contracts for the purchase of supplies and equipment and does not cover contracts for work or services or contracts for the purchase of equipment and supplies which include also the furnishing of work and labor in connection with the installation thereof.

■ The fourth and last contention of plaintiffs is that the proposed revenue certificates do not contain sufficient restrictive provisions to protect a municipality from general liability in case the village fails to perform acts agreed upon under the terms of the certificates.

There is no longer any doubt that a municipality in this state may issue revenue certificates payable solely out of the revenues of a utility such as an electric plant. Sections 475.51, 475.58, and 475.60, subd. 2, recognize this right. We have so held in Williams v. Village of Kenyon, 187 Minn. 161, 244 N. W. 558; Davies v. Village of Madelia, 205 Minn. 526, 287 N. W. 1; Struble v. Nelson, 217 Minn. 610, 15 N. W. (2d) 101.

The resolution providing for the issuance and sale of the revenue certificates states expressly that they shall be "payable solely from the revenues to be derived from the operation of said system." After providing for the time of payment, the form of certificate to be used, as set forth in the resolution, provides the method of payment in detail. Thereafter, for the protection of the certificate holder, the village covenants and agrees in part: (a) To construct the plant and system and devote the proceeds of the certificate sold to the payment thereof; (b) to operate the plant as a revenue-producing utility free from competition as soon as the franchise granted to the Otter Tail Power Company expires; (c) to maintain rates sufficient to pay principal and interest of the certificates and to give no free service to the village; (d) to create a light plant fund and to make no payment therefrom except expenditures

Nineteenth Judicial District, Judge Stolberg. (See, Respondents' Brief, Appendix, pp. 90 to 96.)

rightfully incurred in the operation of the plant; (e) to keep proper books and records of the operation of the plant and to cause them to be audited annually by a certified public accountant; (f) to keep the plant and equipment insured; (g) to authorize no extensions or additions until the full amount of $25,000 shall be set aside in a reserve account and not less than 90 percent of the electric users of the village shall have been connected to the system. The resolution then contains this provision:

"In event any principal of or interest on any certificates issued hereunder shall become due and remain unpaid for more than thirty (30) days, such nonpayment shall constitute a default. In event of any such default holders of twenty percent (20%) or more in principal amount of outstanding certificates *shall be authorized to bring any proper action or proceeding on behalf of all holders of certificates and shall have all rights granted by the State of Minnesota for the enforcement of all obligations created hereunder.*" (Italics supplied.)

The form of the certificate to be used as set forth in the resolution contains the following paragraph:

"This certificate is one of an issue in the total principal amount of $275,000, all of like date and tenor except as to maturity, interest rate and provision for redemption, which certificates have been issued for the purpose of providing money to finance the constructing, equipping and operation of the electric light plant and system of said village and the said certificates and interest thereon are payable solely and exclusively from the net revenue of the electric plant and system pledged to the payment thereof and do not constitute a debt of the village within the meaning of any constitutional or statutory limitation of indebtedness. In event of any default hereunder, the holder of this certificate may exercise any of the rights and privileges granted by the laws of the State of Minnesota, subject to the provisions of the authorizing resolution of the village council."

It is the contention of plaintiffs that the italicized portion above may leave the door open to a general liability on the part of the village in case of a default in the performance of any of the covenants and agreements entered into by the village.

In Struble v. Nelson, 217 Minn. 610, 15 N. W. (2d) 101, we held that a covenant to maintain existing rates and a covenant to carry insurance are covenants for the performance of an act and do not create a general liability or debt. The same must be said to be true of all the covenants mentioned above. The only question is whether a default in the performance of such a covenant may create a general liability on the part of the village. Plaintiffs urge, for instance, that if the village fails to carry insurance and a loss results the village may become liable for such loss. We do not believe the resolution or the provisions of the revenue certificates under any circumstances can create a general liability on the part of the village. The provision granting to the certificate holder "all rights granted by the State of Minnesota for the enforcement of all obligations created hereunder" must be read together with the provision of the certificates that they are payable solely out of the earnings of the plant and system. We know of no remedy granted by the state of Minnesota for the enforcement of such certificates which will create or cause a general liability on the part of the village. We need not determine whether the village might suffer a tort liability for failure to keep the covenants mentioned. It is clear that the certificates themselves and the resolution do not create a general liability. Neither do we need to decide what rights are granted by the state of Minnesota for the enforcement of such obligations. It is entirely possible that rights such as those of injunction or mandamus to compel the village to perform the covenants and agreements which it had entered into are those intended by the resolution. Presumably, the holder of the certificate has some rights to compel the village to live up to its agreement, but that does not transform the revenue certificate into a general obligation or liability of the village. It is clear that the right to collect the certificates is limited to the revenues of the plant. Whether some wrongful act on the

part of the village might create a separate and distinct liability is beside the point. We must presume that the village will act in good faith in the performance of its covenants. If it does so, we do not see how it·can become liable under these certificates except to the extent expressed therein.

We find no reversible error.

Affirmed.

