MARK G. DUFFY AND OTHERS v. VILLAGE OF PRINCETON AND OTHERS.[1]

July 10, 1953.

No. 36,057.

[1]Reported in 60 N. W. (2d) 27.

10

*Leonard M. Paulson, Briggs, Gilbert, Morton, Kyle & Macartney,* and *Frank Hammond,* for appellants.

*Clarence C. Mitchell, Faegre & Benson,* and *Charles B. Howard,* for respondents.

FRANK T. GALLAGHER, JUSTICE.

Appeal from an amended judgment of the district court whereby it was determined in substance that all action taken by the defendant members of the public utilities commission of the village of Princeton was in accordance with the provisions of the statutes of the state of Minnesota with respect to public contracts.

On December 26, 1951, the public utilities commission of Princeton, referred to hereinafter as the commission, retained G. M. Orr Engineering Company to prepare plans and specifications for a Diesel generating unit for its municipal power plant. The plans and specifications were submitted at a meeting of the commission on February 4, 1952. The chairman, with no objection from any of the other members of the commission, directed that a change be made with respect to classification of the units on the basis of high- and low-speed engines. The plans and specifications were then approved. The next meeting of the commission was held on February 26, 1952, for the purpose of opening bids. Between that date and the next meeting of the commission, the engineers prepared a report in which it was stated that some of the bids were not acceptable, with comments on the bids which they did consider ac-

ceptable. On April 1, 1952, a resolution was adopted by the commission accepting the bid of defendant National Supply Engine Corporation, referred to hereinafter as National.

This action was commenced on April 7, 1952, by plaintiffs as residents, voters, citizens, taxpayers, and consumers of electricity, in their own behalf and in behalf of others similarly situated, to annul and set aside the award of the contract to National; to enjoin and restrain defendants from entering into, executing, or performing the proposed contract; and for other relief not pertinent to this appeal.

It is the claim of plaintiffs (1) that the specifications furnished by the commission were defective for reasons hereinafter stated; (2) that the bid of National did not comply with the specifications and was therefore incapable of acceptance by the commission; and (3) that, in awarding the contract to National, the commission acted in an arbitrary and unreasonable manner and thereby abused its discretion. The trial court found against plaintiffs on all three contentions.

■ According to plaintiffs, the provision which invalidates the specifications is as follows:

"If this Bid is accepted, the undersigned agrees to furnish a satisfactory Performance Bond and to execute form of contract as specified in the General Contract Conditions, and further agrees that if awarded contract, work on project will be commenced within _____ working days after receipt of notice, and that the Contract will be fully completed within _____ consecutive calendar days thereafter."

They argue that this voids the specifications because each bidder was permitted to determine the time of performance and there was no definite standard upon which the bidders could compete. The trial court concluded that the specifications were sufficiently definite to afford a common standard of competition in bidding as required by law. The general rule of law applicable to specifications is that they must be sufficiently definite and precise to afford a basis for bids and they must be free from restrictions, the effect of which

would be to stifle competition. Davies v. Village of Madelia, 205 Minn. 526, 287 N. W. 1; Rice v. City of St. Paul, 208 Minn. 509, 295 N. W. 529; 4 Dunnell, Dig. & Supp. § 6707.

In deciding whether such a common standard existed, we are faced with the testimony of G. M. Orr of the G. M. Orr Engineering Company, who has had extensive experience in drawing specifications such as the one in question. According to Mr. Orr the provision which is questioned by plaintiffs was the usual provision used when advertising for bids on power equipment. It was his opinion with regard to such specifications that, if a specific date of completion were provided by the commission, no bids would be received. In Davies v. Village of Madelia, *supra,* the court indicated that the controlling principle is that, where the governing body has the power to contract, the means of accomplishing such object should be left to it, as long as the means are such as are customary and reasonable. In the light of Orr's testimony, there seems to be no substantial prejudice to any of the bidders, and the provision seems to be both customary and reasonable. We feel, therefore, that the trial court should be affirmed on this point.

■ The second issue raised by plaintiffs is whether the bid of National contained substantial variations from the specifications which rendered it void and unacceptable. The test of whether a variance is material is whether it gives a bidder a substantial advantage or benefit not enjoyed by other bidders. Coller v. City of St. Paul, 223 Minn. 376, 385, 26 N. W. (2d) 835, 840; City of Bemidji v. Ervin, 204 Minn. 90, 282 N. W. 683; 43 Am. Jur., Public Works and Contracts, § 40. The question seems to resolve itself into whether the evidence gives ample support for the trial court's finding. Sutton v. City of St. Paul, 234 Minn. 263, 269, 48 N. W. (2d) 436, 440.

Plaintiffs claim that the bid of National varies materially and substantially in three different respects, to wit: (a) cylinder liners; (b) time of performance; and (c) time of payment. In all three instances the trial court concluded that any variance was unsubstantial and immaterial.

(a) In connection with the matter of re-borable cylinder liners, the specifications stated (section II, paragraph 8):

"The cylinders shall be so constructed as to enable several reborings. The cylinder liners, if cylinder liners are used, shall be bored true and smooth, and of sufficient thickness to safely allow for several reborings."

In a section labeled "REMARKS" in the bid of National, it was stated:

"We wish to advise that we cannot meet the specifications in regard to Par. 8 of Section II. Our cylinder liners are not manufactured to permit reboring since it would be uneconomical to rebore liners and furnish oversize pistons. Ample liner wear is permissible before attention is required."

With respect to the alleged variation, it appears from the evidence that as a consequence of the operation of this type of engine a wearing of the cylinder walls results requiring a renewal of the surface of the cylinder cavity. Further, it appears from the testimony of G. M. Orr that, in nine out of ten cases in which it is possible to re-bore the cylinders, the piston and piston rings must also be replaced, while in the case of the type of engine which was accepted, a renewal of the surface of the cylinder wall could only be done by replacing the cylinder liners. There is testimony to the effect that re-boring costs from one-fourth to one-half of the cost of replacing the cylinder liners. However, it also appears from the record that, where it is possible to re-bore cylinder liners, it can be done only twice. There is no evidence in the record to show how many times within the life of the engine the surface must be renewed nor what the actual comparative costs are; thus the court could not find that there would be a substantial difference in costs. In this respect the trial court said in its memorandum:

"* * * The evidence pertaining to the frequency of such reboring or replacing of the cylinder liners within a given period or the life of the engine, and the comparative cost in dollars for such maintenance, is wholly lacking. Nor do such factors as the general care

of the engine, the nature and extent of its operation, the load contemplated to be borne during operation, and perhaps other factors, appear in evidence to permit the Court to infer that the cost of replacing cylinder liners over the cost of reboring them would be substantial."

In view of the further fact that G. M. Orr testified that in his opinion the fact that the cylinder liners of the engine accepted could not be re-bored was immaterial, the trial court's finding that this did not constitute a substantial or material variance must be upheld.

(b) With regard to the time of performance, as pointed out above, the specifications were silent concerning a specific date of completion. They did, however, provide (section I, paragraph 21) :

"As time is the essence of this project, the Contractor shall complete his work at the earliest possible moment, and shall plan the work so there is no unnecessary delays."

With respect to this, the bid of National contained the following statement:

"Our shipment and project completion have been given in your prescribed bid form. While it is our intention to ship material and complete the work in the period specified we must offer this bid with the understanding that we are not being held responsible for delays due to causes beyond our control.

"Delivery estimated in this quotation subject to adjustment, government or commercial, made by us prior to receipt of this award, provided we are so favored."

It would seem from the provision in the specifications that the commission was notifying prospective bidders that it wanted the work completed without any unnecessary delay but that it was allowing the bidders to specify the time for completion which they saw fit. National replied in its bid by saying that the work would be commenced within ten working days after receipt of notice and would be completed in 215 consecutive calendar days thereafter if no unforeseen delays beyond its control arose. This at least gave

the commission definite knowledge as to when National expected to start and complete the job if it was the successful bidder. This was not anything which the other bidders were precluded from doing; all could have responded in the same manner. That being so, it cannot justifiably be said that this resulted in a substantial benefit to the bidder whose bid was chosen. Thus, the trial court's finding that this was not a substantial or material variation must be upheld.

(c) With regard to time of payment, section I, paragraph 14, provided:

"The contractor shall submit to the Engineers an application for each payment at least five days before such payment falls due. Payments on account of contract shall be made upon written certificate issued by the Engineers, not more than once every thirty days as work progresses, but the total of such payments on account shall at no time exceed ninety percent of the value of the materials used or materials suitably stored on site and labor performed, * * *.

"The contractor may be asked to await any payments until equipment has been installed complete when revenue certificates can be sold and contractor reimbursed. But in no event shall payment be delayed more than 15 days after commencement of operation of all equipment."

In reply to this provision of the specifications, National's bid contained the following statement:

"Terms: Payment by the 10th of each month of 90% of the value of materials delivered to the site and work performed during the preceding month.

"10% upon completion and acceptance.

"(In accordance with the first paragraph of Article 14, 'Payment to Contractor's', on Page 3 of Section 1 of the General Conditions of the Specs.)"

Plaintiffs argue in effect that this provision of the bid indicates that National would not be willing to wait for its money until the equipment was in operation but, on the tenth of each month, must

be paid an amount equal to 90 percent of the value of the work and material furnished during the preceding month.

The trial court concluded that any variance between the accepted bid of National and the specifications was unsubstantial and immaterial. In this respect it said in its memorandum:

"* * * To infer from the language used that National would refuse to await payment as set out in the warning, if requested, seems speculative and therefore unreasonable. Although such might be termed a variance in the strict use of the word, it can hardly be termed a material and substantial variance in the light of the facts relating to the reason and purpose of inserting the warning clause in the specifications. To regard it otherwise, and thereby overturn the will of the governing body on this point alone, would seem to impose an exceedingly strict limitation on the discretionary power of municipal authorities and to even extend the holdings of the cases bearing on the question."

There is no evidence in the record that National would refuse to await payment if necessary. To find in accordance with plaintiffs' contention, the trial court would have had to indulge in speculation and impose its will upon the commission. Therefore, we must affirm the trial court's finding that this did not constitute a material and substantial variance from the specifications.

The third issue raised by plaintiffs is whether the commission acted in an arbitrary and unreasonable manner in awarding the contract to National. The trial court concluded that the commission's action in accepting National's bid was based on a substantial difference in quality and suitability and was neither arbitrary nor unreasonable.

In selecting the lowest responsible bidder a municipality may exercise a reasonable discretion. Considerations other than price may be utilized such as quality, suitability, and adaptability of the article to be purchased for the use for which it was intended. Where it appears that the commission's choice is based on a substantial difference in quality, suitability, and adaptability, its action will

not be interfered with. Otter Tail Power Co. v. Village of Elbow Lake, 234 Minn. 419, 49 N. W. (2d) 197, 27 A. L. R. (2d) 906.

Without going into a detailed discussion of the evidence, it appears from the record that the members of the commission spent a reasonable amount of time investigating the various types of engines. Also, bids were received on several engines, and each was explained fully to the commission. There is testimony to the effect that one of the best ways to evaluate an engine of the type in question is to determine its cost per kilowatt hour. On this basis, the only acceptable engine with a lower price was a high-speed, opposed cylinder, two-cycle engine. The commission decided that a low-speed engine was best suited to its needs. With respect to these two types of engine, it appears that there is a substantial difference in construction and operation and that among some engineers there is a feeling that four-cycle engines are superior to two-cycle engines. Further, it is generally assumed by some engineers that low-speed engines have a longer life than high-speed engines. In view of this evidence, we feel that there was at least room for the exercise of discretion on the part of the commission in deciding on a low-speed engine; and since it chose from the low-speed engines the lowest priced on the basis of price per kilowatt hour, the trial court's finding that the commission did not abuse its discretion must be affirmed.

Affirmed.

Mr. Justice Christianson took no part in the consideration or decision of this case.