# OTTER TAIL POWER COMPANY AND ANOTHER v. K. B. MacKICHAN, d.b.a. K. B. MacKICHAN & ASSOCIATES, AND OTHERS.

133 N. W. (2d) 511.

February 5, 1965—No. 39,446.

*Field, Arvesen, Donoho & Lundeen,* for appellants.

*Johanson, Winter & Lundquist,* for respondent MacKichan.

*Richard E. Kyle, Frank Hammond,* and *Briggs & Morgan,* for respondent Fairbanks Morse.

*Henry G. Tweten,* for respondent Holt.

MURPHY, JUSTICE.

This is an appeal from a judgment entered in favor of the defendants in an action in equity to enjoin the construction of a municipal electric plant and the sale of revenue certificates to finance the same and to determine the legality of certain contracts entered into in connection with the project. The action is brought by Otter Tail Power Company and A. L. Anderson, a resident taxpayer of the village of Elbow Lake, against the village of Elbow Lake; its municipal officers; K. B. MacKichan, doing business as K. B. MacKichan & Associates, consulting engineer; and Fairbanks, Morse & Company and Kenneth Holt, doing business as Northolt Electric Company, who were awarded contracts relating to the construction and installation of a municipal power plant.

The attack upon the legality of the contracts raises numerous questions, some of which have been reviewed by this court in Otter Tail Power Co. v. Village of Elbow Lake, 234 Minn. 419, 49 N. W. (2d) 197, 27 A. L. R. (2d) 906; Otter Tail Power Co. v. Village of Wheaton, 235 Minn. 123, 49 N. W. (2d) 804; Davies v. Village of Madelia, 205 Minn. 526, 287 N. W. 1; and Duffy v. Village of Princeton, 240 Minn. 9, 60 N. W. (2d) 27. The principal errors as-

serted here are directed to the specifications upon which bids were required to be submitted. It is claimed that these specifications were contrived to favor Fairbanks Morse and to exclude or discourage competitive bidding. It is further asserted that the successful bid for the power plant was at substantial variance with the specifications; that the specifications for the distribution system did not provide for a firm bid; and that the prospectus offering bonds for sale contained material misrepresentations.

From the record it appears that for some time prior to 1961 the citizens of Elbow Lake and its municipal officers had considered and investigated the advisability and desirability of establishing a municipal electric light and power plant for the purpose of supplying electric utility service to the village and its inhabitants.[1] Investigations of other municipally owned electric plants had been made by the village. In September 1961, as a result of these investigations, the village council employed defendant MacKichan to make a preliminary survey and report with reference to the electrical needs of the village and the estimated cost of a municipal plant. The village chose one of several proposed plans which provided for a generating plant to furnish all of the electrical needs of the village and a new distribution system. The village council passed a resolution determining that it was necessary and

---

[1]Minn. St. 412.321, subd. 2, provides: "No gas, light, power, or heat utility shall be constructed, purchased, or leased until the proposal to do so has been submitted to the voters at a regular or special election and been approved by five-eighths of those voting on the proposition. Such proposal shall state whether the public utility is to be constructed, purchased, or leased and the estimated cost or the maximum amount to be expended for that purpose. This proposal and a proposal to issue bonds to raise money therefor may be submitted either separately or as a single question. The proposal for the acquisition of the public utility may include authority for distribution only or for generation or production and distribution of a particular utility service or group of services. Approval of the voters shall be obtained under this section before a village purchasing gas or electricity wholesale and distributing it to consumers acquires facilities for the manufacture of gas or generation of electricity unless the voters have, within the two previous years, approved a proposal for both generation or production and distribution."

for the best interests of the village to construct the plant and system at a total estimated cost of $715,000 and to finance their construction by issuance of revenue certificates. Such certificates would be payable solely from the revenues of the plant and system. The project was submitted to and approved by the electors at a special election held January 23, 1962. Thereafter, on March 13, 1962, the village entered into a contract with MacKichan retaining his firm as consulting engineers of the project, which included the preparation of the plans and specifications. The final plans and specifications prepared by MacKichan were duly approved by the village council. They were divided into two parts, one for the power plant and the other for the electrical distribution system. Pursuant to advertisement for bids as provided by law, the village council, on October 5, 1962, accepted the bid of Fairbanks Morse, the lower of two bids received for the power plant, and the bid of Northolt Electric Company for the electric distribution system. Subsequently, contracts were entered into between the village and the successful bidders. On September 5, 1961, the village had entered into a contract with Springsted, Inc., a finance corporation of St. Paul, Minnesota, whereby the village employed it to render services in connection with the sale of revenue certificates. The council duly passed a bond resolution providing for the issuance and sale of revenue certificates aggregating $670,000 of principal amount. Bids were called for the sale of the bonds, to be received on October 30, 1962. But this action intervened to suspend further proceedings.

It should be further noted that plaintiff Otter Tail Power Company for several years prior to the commencement of this lawsuit had been furnishing electricity to the village and its inhabitants under a nonexclusive franchise. Its franchise expired in 1960 and had not been renewed.

Among the numerous allegations contained in the complaint, plaintiffs asserted, and at trial attempted to prove, that defendants conspired and planned to restrict and limit competitive bidding; that the bids did not, in fact, conform to the plans and specifications; that the plans and specifications for the electrical distribution system were illegal in that they provided for a unit price basis rather than a firm

bid; that the prospectus issued in connection with the proposed sale of revenue certificates was illegal in that it contained inaccurate or misleading assumptions with respect to the debt services and available revenues for payment of the debt; that the plans and specifications contained an inadequate provision relating to fuel guarantees; and that the plans and specifications were inadequate in that they omitted certain items alleged by plaintiffs to be essential to the operation of the distribution system. After a long and complicated trial, which included a great deal of technical evidence relating to the mechanical and engineering features of the proposed power plant, the trial court fully considered the contentions of the respective parties and made findings of fact by which it determined, contrary to the claims of plaintiffs, that the contracts were in all respects lawful.

We first consider the claim of plaintiffs that the contract for the construction of the power plant is unlawful because the specifications with reference to the engineering and mechanical factors of the diesel power engines were tailored to favor the Fairbanks Morse engines and made it difficult, if not impossible, for other manufacturers to bid competitively. It is specifically asserted by plaintiffs that the specifications were restrictive in that engineering factors governing range of capacity of the engine, rotative and piston speeds, and brake mean effective pressure were contrived to fit the Fairbanks Morse product and excluded that of other manufacturers. It is unnecessary to review the lengthy record as it relates to the comparative mechanical and engineering factors of the various diesel engines used as power generating units. It is sufficient to observe that the technical terms, by which the specifications describe the desired features of the engines, all have a bearing upon the capacity, efficiency, reliability, cost of maintenance, and life of the machine. The specifications provided for a range of capacity from 1,050 kilowatts to 1,200 kilowatts. They provided for a maximum rotative speed of 720 revolutions per minute and a maximum piston speed of 1,250 feet per minute. The specifications express the desired brake mean effective pressure for various types of engines in terms of pounds per square inch, ranging from 85 to 145. It may be said that rotative speed and piston speed relate to thermal and mechanical stress-

es which affect the reliability of the engine. It may also be said that these speed factors influence the useful life of the engine, the cost of maintenance, and overall reliability. Brake mean effective pressure relates to thermal conditions and mechanical stresses likely to exist inside the cylinder. It would appear that this factor is variable and not one by which dissimilar engines can be accurately compared for the reason that any one engine design can be rated over a wide range by the simple device of changing the brake horsepower value.

In support of their claim that the specifications are restrictive, plaintiffs have relied largely upon certain exhibits relating to specifications for diesel power units on which bids were submitted at Burlington, Kansas; Commerce, Texas; Crosbyton, Texas; Pleasant Hill, Missouri; and Perry, Oklahoma, as illustrating that where specifications are less restrictive more manufacturers are able to submit competitive bids. But there was evidence from which the court could find that other manufacturers can and do bid against Fairbanks Morse and that they could have met the specifications provided for the Elbow Lake contract. It would appear that the Worthington and Cooper-Bessemer companies could have bid one of their engines as they did at Commerce, Texas, and that the White Company could have bid one of its engines by the expedient of derating it so as to conform. It also appears from the bids submitted at the other cities that it is common practice to submit different specifications for the same engine. One of the witnesses for plaintiffs contended, however, that even though it might be possible to derate an engine to meet specifications, it is not practical nor common. He said:

"* * * [T]o take a 1500 kilowatt engine and quote it at some lesser rating such as 1100, 1200, or somewhere in there, would not present a condition which is worth the time for us to submit the bid. As I mentioned * * * it is like trying to get a man to buy a fancy Cadillac on the specification of a compact."

The defendant village, however, argues that it was reasonable to provide specifications for a plant which would have sufficient capacity and dependability to meet the needs of the community and at the same time not be so large as to require a greater investment and mainte-

nance cost than necessary. It argues that if the Fairbanks Morse engine is to be considered a "compact" as against the other engines, and if the village desires a "compact," they should not be forced to broaden their specifications to include all engines. There would be no point in calling for bids on an installation which would not meet the needs of the village either physically or economically.

The village further points out that limitation upon capacity of the engines was required because the plant was to be an "isolated plant"; that auxiliary power would not be available; and that a two-engine installation was required which would provide a standby engine capable of carrying the entire load during the necessary down time. The particular problem was explained by one of the engineers who testified for the village as follows:

"It was my understanding that the type of a plant was to be one which was to be the sole supplier of electrical energy to the village of Elbow Lake, that there were to be no interconnections or other sources of supply which could be drawn upon for standby or for peak load.

"Q. Is that what you referred to yesterday as an isolated station?

"A. Yes.

\*   \*   \*   \*   \*

"Q. And that differs in what respect from other types of generating plants?

"A. Other types of plants may be interconnected or have some other source which can back them up in case of a breakdown, and thus in the selecting of equipment there can be a greater allowance for such a possibility.

\*   \*   \*   \*   \*

"A. An isolated station is the only thing that the Village would have to depend upon, therefore a degree of conservativeness in design is required in order to give greater assurance that that station will operate continuously with a minimum of maintenance in order to supply the energy to the customers."

1-2-3. With these preliminary statements we may turn to the principles of law which must control our decision. It is well established that

there must be a reasonable relation between the purpose of the specifications and the character of the product or equipment to be furnished under the contract and that the specifications must be free from restrictions, the effect of which would be to stifle competition. Davies v. Village of Madelia, 205 Minn. 526, 287 N. W. 1; Duffy v. Village of Princeton, 240 Minn. 9, 60 N. W. (2d) 27; Otter Tail Power Co. v. Village of Elbow Lake, 234 Minn. 419, 49 N. W. (2d) 197, 27 A. L. R. (2d) 906. In Foley Brothers, Inc. v. Marshall, 266 Minn. 259, 263, 123 N. W. (2d) 387, 390, we emphasized that the statutory and municipal charter provisions requiring competitive bidding also require that public officials should adopt definite plans and specifications with respect to the subject matter of the contract and that they be "so framed as to permit free and open bidding by all interested parties." In Nielsen v. City of St. Paul, 252 Minn. 12, 18, 88 N. W. (2d) 853, 858, we said that when the courts are called upon to review the legality of methods adopted by municipal authorities in the letting of contracts, their obligation is "to determine whether officials in the exercise of their discretion have applied the method used in an arbitrary, capricious, or unreasonable manner," and that such officials may be enjoined from illegal acts which are "an arbitrary, capricious, or unreasonable exercise of power." In Griswold v. County of Ramsey, 242 Minn. 529, 536, 65 N. W. (2d) 647, 652, we pointed out that a fundamental purpose of competitive bidding for public contracts "is to deprive or limit the discretion of contract-making officials in the areas which are susceptible to such abuses as fraud, favoritism, improvidence, and extravagance." We also held in that decision that generally it is presumed that public officials have entered into public contracts in good faith, and actual fraud in a particular instance must be proved except in those cases where procedure is followed "which emasculates the safeguards of competitive bidding."

4. In the earlier case of Otter Tail Power Co. v. Village of Elbow Lake, *supra,* where Fairbanks Morse was the only bidder and was awarded the contract, it was also contended that the specifications were so restrictive as to preclude bids by competitors. We held that although only one bid was submitted, the evidence nevertheless showed that

several concerns could have met the specifications had they desired to do so. We went on to say (234 Minn. 425, 49 N. W. [2d] 202):

"* * * The fact that they could not meet a competitive price does not make the specifications too restrictive to permit competitive bidding. In purchasing equipment of this kind, the municipality must be allowed a reasonable latitude in determining what type of equipment will best suit its needs. It is not necessary for the municipality so to prepare its specifications that every manufacturer of the type of equipment can meet the competitive price of every other manufacturer."

5. It must be further kept in mind that whether the specifications were so drawn as to exclude free and unrestricted bidding is a fact question, and where there is sufficient evidence to support the findings of the trial court, this court must affirm. Ahlquist v. Commonwealth Elec. Co. 194 Minn. 598, 261 N. W. 452. On this issue before us, the trial court found:

"The plans and specifications upon which said contracts were let are in all respects lawful, reasonable and proper, and are sufficiently definite and precise to afford, and did in fact afford, a proper basis for competitive bidding. They were designed to, and did in fact, permit free and unrestricted competition. They are the kind of specifications the Village Council, [in] the exercise of its discretion, was authorized to approve and adopt."

Here, the record indicates, as it did in the earlier case of Otter Tail Power Co. v. Village of Elbow Lake, *supra,* that several of the competing manufacturers, if not all of them, produced an engine capable of meeting the specifications as drawn. If they failed to submit bids, presumably it was because they did not feel they could do so competitively.

6. We should not leave the subject of the legality of the specifications without making a further observation. The record shows that by thorough and searching examination of witnesses, plaintiffs' counsel developed certain evidence from which it might appear that the village officials and their consulting engineers favored the Fairbanks Morse product from the outset. The evidence would indicate that they may

have had in mind the kind of a plant with the features and advantages found in the Fairbanks Morse engine and that this predilection finds expression in the specifications. We cannot agree, however, that this preference infects the transaction with illegality. Before undertaking a municipal improvement of the proportions anticipated, it would only be natural to expect the municipal officials to draw upon the experience of other municipalities engaged in the operation of power plants. The record indicates that the officials were aware of the fact that Fairbanks Morse had in Minnesota more than twice as many municipal installations as all of its competitors combined and nearly five times as many engines in operation as its closest competitor. Moreover, they were not unaware of the fact that that company provided adequate supplies and parts, accessible service, and factory representatives which were available on short notice. Even though the record may indicate a partiality to the product of the successful bidder, we do not feel that under the facts in this case it can be fairly said that there was a suggestion of fraud, favoritism, or corruption, which would taint the contract with illegality or prevent fair competition which would provide the best results at the lowest price for the protection of the municipality. Coller v. City of St. Paul, 223 Minn. 376, 26 N. W. (2d) 835.

7. It is next contended that the bid was at substantial variance with the specifications. The claim arises from this circumstance: There was found in the envelope by which the bid was transmitted an enclosure entitled "Guaranty of Material and Workmanship" which did not conform to the guaranty required by the specifications. Fairbanks Morse contends that this enclosure was a "fugitive piece of paper" and represented only an "informational copy" of the standard form of warranty. It asserts, and the trial court apparently agreed with it, that the enclosure was not a part of the bid and not responsive to anything in the plans, specifications, proposal form, or contract provisions, and that the bid actually contained a proper guaranty which met with the proper requirements of the proposal. We conclude on the basis of the record that the specific guaranty contained in the bid in response to the proposal is controlling.

8. Plaintiffs next contend that the contract for the distribution sys-

tem is illegal because the specifications failed to provide for a firm bid. It appears that the specifications provided for the submission of bids by units of construction, the final price to be determined when the engineer tabulated the number of units required. The trial court held that they were sufficiently definite and precise to afford a proper basis for competitive bidding. Northolt Electric Company, which was awarded the contract for the distribution system, was the lowest bidder by approximately $40,000. The final total bid was simply a mathematical extension of the unit prices. Plaintiffs rely on Griswold v. County of Ramsey, *supra*. That case involved a contract for the construction of a new Ramsey County jail. A large number of alternates were provided. We held that the complex nature of the alternates, together with the reserved right by the owner to select, within a 6 months' period, which of the various alternates should be performed by the successful bidder, made it impossible to tell who was in fact the lowest responsible bidder until such time as the alternates were selected. We agree with the trial court that that authority has no application to the facts in this case.

In Sutton v. City of St. Paul, 234 Minn. 263, 48 N. W. (2d) 436, we held that the method of calling for bids on a unit basis for radio communication equipment, which indicated the maximum quantity to be provided but where it was not known at the time how many would be actually needed, was not in contravention of a charter provision that the quantity of articles to be purchased be specified in the proposal. We agree with the trial court that under the circumstances here, where it could not well be determined the number of the various units to be installed in the establishment of the transmission system, it was reasonable to ask for bids on a unit basis. It cannot be demonstrated here that this method is in any way contrary to the best interests of the municipality or that it indicates bad faith or favoritism.

9. It is next contended that equitable principles prevent defendants from offering the bonds for sale under a prospectus containing material misrepresentations. The asserted misrepresentations to which plaintiffs refer are that the cost of the operation of the plant will remain constant for the period from 1963 through 1982; that the suggested maintenance costs, including fuel supplies, postage, telephone

and telegraph, etc., are inaccurate; and that the computations with reference to the useful life of the generating plant and depreciation account are misleading and erroneous. We decline to further burden this opinion with a discussion of the conflicting arguments relating to this point, which involve a mass of engineering and accounting data. It is sufficient to say that there was evidence from which the court could find that the cost study presented by MacKichan and utilized in the prospectus was not incorrect and that the prospective purchasers would not have been misled concerning the ability of the village to retire the bonds.[2]

10. Counsel for plaintiffs have overlooked no aspect of the transaction which might indicate a legal infirmity. It is unnecessary for us to discuss all of the points which they raise since they relate basically to fact issues which have been resolved by the trial court. We have held

---

[2]Plaintiffs could hardly expect the trial court to be persuaded by the testimony of their accountant who gave evidence in support of this particular claim. The following is part of his testimony:

"Q. All right, Mr. Johnson, since your graduation, have you ever prepared a preliminary cost study for any municipality?

"A. No.

"Q. Have you ever prepared a final cost study for any municipality?

"A. No.

"Q. I'm referring to electricity now, on electricity, on power plants, neither one? Your answer is no, on both of them? You've never prepared a cost study for a municipality?

"A. For their use?

"Q. Yes?

"A. No.

"Q. Have you ever prepared a prospectus as indicated by Plaintiffs' Exhibit number 43?

"A. No.

"Q. Have you ever been employed as an investment banker or broker?

"A. No.

"Q. Have you ever sold securities in the state of Minnesota?

"A. No.

"Q. Have you at any time been in the business of analyzing prospectuses on municipal securities or revenue certificates?

"A. No."

that mere irregularity of a bid will not justify its rejection by a municipal body charged with the duty of awarding a contract to the lowest bidder. Nor should the municipality be denied the benefit of a low bid on a public contract for every minor technical defect that does not affect the substance of the bid. Foley Brothers, Inc. v. Marshall, 266 Minn. 259, 123 N. W. (2d) 387.

11. It is elementary that an appellate court must consider the evidence in the light most favorable to the prevailing party, and if the evidence as a whole tends to support the findings, they should not be disturbed. Here, we do not think that the plaintiffs have met the burden of establishing that there is not substantial evidence reasonably tending to support the trial court's findings.

Affirmed.