CENTRIC CORPORATION, a Colorado corporation, and Larry Lawton, Appellants (Plaintiffs below),

v.

BARBAROSSA & SONS, INC., a Minnesota corporation, et al., Appellees (Defendants below).

No. 4382.

Supreme Court of Wyoming.

April 30, 1974.

Ward A. White of Guy, Williams & White, Cheyenne, Hugh J. McClearn of Conover, McClearn, Burkhardt & Heppenstall, P. C., Denver, Colo., for appellants.

Paul B. Godfrey and John A. Sundahl, Cheyenne, for appellee Barbarossa & Sons, Inc.

Carl L. Lathrop, of Lathrop, Uchner & Mullikin, P. C., Cheyenne, for all other appellees.

Before PARKER, C. J., and McEWAN, GUTHRIE, McINTYRE, and McCLINTOCK, JJ.

Mr. Justice McEWAN delivered the opinion of the court.

This was an action concerning contract bids for the construction of a sewage disposal plant for the Board of Public Utilities of the City of Cheyenne, Wyoming. Centric, as a contract bidder,[1] brought the action alleging that the Board should have accepted its bid because it was the lowest. The Board rejected Centric's bid on the basis that it did not comply with the bid specifications. The trial court denied Centric's claim and it has appealed.

The Board called for bids for the construction of a waste water treatment plant, which project was funded 75% by a Federal grant through the Environmental Protection Agency (EPA) and 25% by revenue bonds. When the bids were opened at 10 a.m. on March 20, 1974, it was determined that Centric Corporation's bid of $3,244,000.00 was $45,300.00 less than the next low bid of $3,289,700.00 submitted by Barbarossa & Sons, Inc. Upon opening the bids a representative of Barbarossa protested the bid of Centric on the ground that it did not contain an Affirmative Action Plan as specified in the Instructions to Bidders, which Plan had to do with Federal requirements for nondiscrimination in employment. At 3 p.m. on that same day Centric filed its Affirmative Action Plan with the Board. On March 22, 1974, the Board met in special session to discuss the bid proposals and voted to accept the Barbarossa bid as " * * * the proper and best bid subject to the continued conformance with all EPA requirements * * *," and the director was instructed to notify Barbarossa that their bid had been accepted " * * * contingent upon the approval of the EPA."

In commencing our considerations we must bear in mind the basic premise that members of the Board of Public Utilities are fiduciaries and trustees of the public interest, and they must always strive to secure specified services for the people for the least money. To safeguard public funds by preventing extravagance in their expenditure, the legislature enacted § 15.-1–13, W.S.1957, 1973 Cum.Supp., which provided that all municipal contracts for any public work or improvement exceeding $1,500.00 shall be advertised for bid and " * * * the contract shall be let to the lowest responsible bidder." There is no question that Centric was the "lowest" bidder as its bid was $45,300.00 lower than the next low bid. The Board stipulated that Centric was a responsible bidder but argued that its bid did not meet the specifications because it failed to submit with its bid the Affirmative Action Plan. We are aware, as the Board has argued, that while it must accept the lowest responsible bid, any material departure from the bid specifications invalidates a bid and the defaulting party cannot be classed as a bidder. We are also aware of the converse of that rule which is that a minor technical defect or irregularity which does not affect the substance of the bid does not justify the rejection of the lowest bid.

Therefore, the sole question before us was whether or not the Board had shown that Centric's failure to file its Affirmative Action Plan with its bid was sufficient ground to reject Centric's low bid.

To understand the circumstances at the time the Board rejected Centric's bid it is

---

1. Lawton, as a resident-taxpayer and user of the services of the Board of Public Utilities, intervened as an additional party-plaintiff.

necessary that we explore the events leading up to such determination. Affirmative Action Plans are now an element in all Federally assisted construction projects and came about through Federal Executive Order No. 11246, which established that it was the policy of the Federal Government to provide equal opportunity in Federal employment and Federally assisted construction contracts. The Executive Order provided that a contractor must agree it will not discriminate against any employee or applicant for employment because of race, creed, color or national origin, and it will take *affirmative action* to ensure that applicants are employed, and that during employment they will be treated without regard to their race, creed, color or national origin. Pursuant to the Executive Order the EPA had promulgated administrative rules and regulations designed to ensure compliance with the Order. The practice in the EPA office was to require a contractor who was selected as the lowest bidder by the Board of Public Utilities to submit a written description of its Affirmative Action Plan which was the method whereby the contractor proposed to comply with the nondiscrimination requirements of the Order. If the Plan was acceptable and approved by the EPA, funds were dispersed according to the commitment. During the period of construction, compliance reviews were made by EPA to make sure the Plan was being carried out, and, if not, funds could be withdrawn for noncompliance. If the contractor's Plan was not accepted, the EPA could withhold financial assistance from the project.

The record contained a copy of the minutes of the March 22nd special meeting of the Board which showed that Mr. Gene Hackleman, an engineer with J. T. Banner and Associates, Inc., the consulting engineers for the Board, reported to the Board that Mr. Charles C. Gomez, Regional Director of Civil Rights and Urban Affairs of the EPA, had told him that any bid that did not include an Affirmative Action Plan would be rejected and would not be eligible for Federal participation. The Board was advised by its counsel, Mr. Lathrop, that Mr. McClearn, the attorney for Centric, had advised him that he, McClearn, had talked with Mr. Gomez, who stated that as far as the EPA was concerned there was no requirement that an Affirmative Action Plan be submitted with bids. Counsel for Centric had requested that he be permitted to appear before the Board at the special meeting, but such request was denied. Although there is some confusion it appears the Board was influenced in its decision by Mr. Hackleman's comments that the EPA required that the Affirmative Action Plan be submitted with the bids.

The Board's requirement that an Affirmative Action Plan be submitted with the bid was not a usual procedure and was adopted for the first time on this project. Seven of the ten contractors submitting bids did not attach such Plan with their bids. Prior to the submission of its bid Barbarossa made inquiry of the consulting engineers and was advised the Affirmative Action Plan was required to be submitted with the bid.[2] The requirement that the Affirmative Action Plan be filed with the bids was placed in the specifications prepared by Mr. Hackleman, apparently as a result of some problems the Board had with another contractor on a prior project. The consulting engineers thought this might eliminate some of the problems experienced with the prior contractor, and, further, it was their thought that the EPA required that the Plan be submitted with the bids. The bound volume entitled "Specifications" contained the following reference to the Order and Affirmative Action Plan:

2. In order that there be fair competition the same information should be given to all. One method whereby this could be accomplished would be for the Board to hold a conference well in advance of the bid submission date with all propective bidders invited .to attend, at which time questions—such as the one before us—could be resolved and thereafter none of the prospective bidders furnished any information not available to others.

"NOTICE AND CALL FOR BIDS

Bidders on this work will be required to comply with the President's Executive Order No. 11246, as amended. The requirements for bidders are explained in the Specifications.

"INSTRUCTIONS TO BIDDERS

NONDISCRIMINATION IN EMPLOYMENT. Bidders on this work will be required to comply with the President's Executive Order No. 11246, as ammended [sic]. Bidders shall submit with their proposal a statement as to whether or not they have previously performed work subject to Executive Order No. 11246. In addition, Bidders shall submit with their proposal an affirmative action plan developed along the guidelines and including those provisions contained in EPA Proposed Part 8.8—Affirmative Action Compliance Programs—Construction Contracts and shall also submit documentation indicating the bidder's efforts in implementing the affirmative action program on previous construction.

"COMPARISON OF BIDS. Proposals will be compared on the basis of the bid schedule shown on the Proposal Form. The Contract will be awarded to the lowest responsible Bidder acceptable to the Board of Public Utilities and the Environmental Protection Agency, provided that the bid is within the amount of the available funds.

"CONTRACT FORM

It is further understood and agreed that full compliance with the provisions of Executive Order No. 11246, as ammended [sic], which requires affirmative action to ensure equality of opportunity in all aspects of employment, shall be a condition of this Contract."

It is clear that compliance with the Executive Order was part of the specifications, and whether or not an Affirmative Action Plan was submitted with the bid, the award

contractor would have to comply with the EPA requirements.

At the hearing before the district court it was shown that EPA had no requirement that an Affirmative Action Plan be submitted with the bids. Mr. Gomez, whose duty it was to administer Equal Employment Opportunity rules and regulations throughout Wyoming, testified as to the procedures followed in his office. Upon receipt of notice of the low bidder from the city, his office sends out instructions to the contractor through the city which require the contractor to submit an Affirmative Action Plan to the EPA that is acceptable to EPA. It takes one to two weeks after receipt of a contractor's Affirmative Action Plan for the EPA office to act on it, and work may already have commenced on a project by the time a Plan is accepted. The Board of Public Utilities makes no determination as to the adequacy of a bidder's Affirmative Action Plan, such determination being made solely by the EPA. The Board could have very readily established whether or not EPA had a requirement that an Affirmative Action Plan be filed with the bids. It would seem in considering whether or not to reject a low bid that would have saved the taxpayers $45,300.00, it had some obligation to more fully inquire into this aspect.

We must next then consider the nature of Centric's failure because a minor technical defect or irregularity which does not affect the substance of a bid will not justify rejection of the lowest bid by a public body charged with awarding the contract to the lowest bidder, because to do so would deny the people the benefit of the low bid. National Engineering & Contracting Company v. City of Cleveland, 76 Ohio Law Abst. 303, 146 N.E.2d 340, 345; Otter Tail Power Company v. MacKichan, 270 Minn. 262, 133 N.W.2d 511, 519.

█ One of the considerations given to a determination as to whether a departure from bid specifications is material is whether or not a variation would give a bidder an advantage or benefit not allowed

to other bidders so as to destroy the competitive character of the bidding process. See Eastside Disposal Co. v. City of Mercer Island, 9 Wash.App. 667, 513 P.2d 1047, 1051, where the bidder's failure to sign the bid form was held to be an informality which the city could waive because it did not prejudicially affect the substantial rights of other bidders. Here the failure to submit an Affirmative Action Plan with the bid would not have given Centric any advantage over other bidders. Centric was bound by the specifications in the contract to comply with all the EPA requirements whether or not it filed such Plan with its bid. Without considering Barbarossa's standing to contest Centric's claim, it would seem that since Centric received no advantage or benefit from the irregularity, Barbarossa could assert no claim that it was prejudiced by Centric's failure to file its Plan with the Board. The Plan was filed five hours after the bid opening and before the Board met to consider the bids. Therefore, no delay in processing the matter through the EPA was occasioned by the failure to file it with the bid.

■■ Here we can only conclude that Centric's failure to file its Plan with its bid was a minor and inconsequential technical omission which the Board could and should have waived, and the judgment of the trial court must be reversed. The instructions to bidders contained a provision whereby the Board reserved the right to reject any or all bids and to waive any informalities in bids received. We therefore cannot hold that the Board must accept Centric's bid. All we do hold is that the Board cannot reject Centric's bid on the basis that it failed to attach its Affirmative Action Plan to its bid.

We appreciate that the Board of Public Utilities is composed of unpaid citizens of the City of Cheyenne who unselfishly devote many hours of their time to the interests of the City's water and sanitation systems. As is true in many situations where dedicated people who are willing to take on responsibility in an effort to improve conditions in their community, they are often damned if they do and damned if they don't. In this instance, the Board was faced with a dilemma in that whichever way it turned there was the possibility of a law suit from either Centric or Barbarossa. When it made its decision the Board did not have the benefit of reflection afforded this court, and given the same information and the time for consideration the Board may well have arrived at the same conclusion as did this court.

The specifications called for the contract to be issued within 30 days after the bid opening, and provided that bid proposals could not be withdrawn by a bidder during that period. Since the bids were opened March 20, 1974, and the matter was heard before this court on April 12, 1974, the question arose that the matter might become moot before a decision was rendered by this court. However, in open court counsel for Centric, together with its president, agreed that as to it the said 30-day period would commence to run from the time of entry of the opinion of this court.

The judgment of the trial court is reversed.