TRANSIT TEAM, INC., Appellant,

v.

METROPOLITAN COUNCIL,
Respondent,

Laidlaw Transit Services,
Inc., Respondent.

No. A03–1344.

Court of Appeals of Minnesota.

May 18, 2004.

Mark J. Condon, Johnson & Condon, P.A., Minneapolis, MN, for appellant.

Perry M. Wilson, III, Angela M. Hall, Steven K. Champlin, Dorsey & Whitney, LLP, Minneapolis, MN, for respondent Metropolitan Council.

Charles K. Maier, Erik T. Salveson, Gray, Plant, Mooty, Mooty & Bennett, P.A., Minneapolis, MN, for respondent Laidlaw Transit Services.

Considered and decided by TOUSSAINT, Chief Judge; ANDERSON, Judge; and HUSPENI, Judge.[*]

## OPINION

TOUSSAINT, Chief Judge.

Appellant Transit Team, Inc. challenges the award of the 2003–07 Metro Mobility paratransit service contract to respondent-intervenor Laidlaw Transit Services, Inc., contending that (a) the contract award is not legal because respondent Metropolitan Council failed to adopt new procurement standards as required under Minn.Stat. § 473.392 (2002); (b) even if the council could rely on procurement standards adopted by its predecessor, it substantially deviated from those standards; (c) Laidlaw's proposal was illegal and void where it substantially varied from the requirements in the request for proposals; (d) the district court erred by denying Transit Team relief when it enjoined the council from future paratransit awards and implicitly invalidated the procedures; and (e) the district court failed to make special findings of fact and conclusions of law under Minn. R. Civ. P. 52. Because the district court properly determined that the Metropolitan Council substantially complied with standards adopted by its predecessor, and that those standards remain effective, we affirm the district court's enforcement of the contract between Laidlaw and the council. But because the court improperly enjoined the Metropolitan Council from issuing future paratransit service contracts, we reverse and dissolve the court's injunction.

## FACTS

Before 1994, the Regional Transit Board (RTB) managed public transit services in the Minneapolis–St. Paul metropolitan area, including all paratransit[1] services. That year, in an effort to consolidate and coordinate metropolitan planning, the legislature abolished the RTB, along with the Metropolitan Transit Commission (MTC) and the Metropolitan Waste Control Commission (MWCC), and transferred the three agencies' authorities to respondent Metropolitan Council (the council). 1994 Minn. Laws, ch. 628, art. 2, § 4, subds. 1–3.

Before this legislative action, the RTB had developed standards, procedures and guidelines for the competitive procurement of public transit services. These stan-

---

[*] Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

1. "Paratransit" means all motorized transportation on a regular and continuing basis, excluding regular route transit of passengers, and the delivery of packages in conjunction with that transportation. Minn.Stat. § 174.22, subd. 6 (2002).

dards and procedures were delineated in the RTB's competitive procurement manual, which provided detailed instructions on how the board was to solicit, review, evaluate, and award transportation contracts. The council, upon assuming the RTB's authority, never specifically adopted the RTB's guidelines, but continued to use RTB forms that adhered to the guidelines as "templates" for their own procurement processes.

On October 10, 2002, using the "templates" originally derived from RTB documents, the council solicited proposals for the operation of its Metro Mobility paratransit services for four years. The solicitation, known as a Request for Proposals (RFP), described the services required by the council, provided instructions for preparing the proposals, and explained the criteria under which the proposals would be evaluated. Six companies, including Transit Team and Laidlaw, submitted proposals in response to the RFP.

An evaluation committee analyzed the proposals pursuant to an eight-point evaluation procedure delineated in the RFP. Ultimately, the evaluation committee unanimously chose to recommend Laidlaw's proposal to the council's transportation committee. After public hearings, the transportation committee recommended Laidlaw's proposal to the full council. The council subsequently awarded Laidlaw the Metro Mobility contract.

Transit Team filed suit, seeking an injunction preventing the council from entering into a contract with Laidlaw, a declaration that the contract was illegal and void, and an order to re-bid the contract in compliance with the applicable statute. The district court, after a five-day trial, denied Transit Team's requests, finding that the bidding evaluation process was fair, and that the council substantially complied with the statutory guidelines that

govern competitive bidding. Notwithstanding these findings, the court enjoined the council from issuing any future paratransit service contracts before restructuring its procurement standards, finding that most council staff members were unaware, or at best only partially aware, of the procedures for soliciting and evaluating paratransit bids.

Transit Team, due to the district court's denial of its claims, filed a motion for a new trial, special amended findings of fact, amended conclusions of law, and amended judgment. The district court denied these motions, and Transit Team now appeals. The council, due to the court's injunction, filed a notice of review.

## ISSUES

I. Does Minn.Stat. § 473.392 (2002) apply to competitive bids for paratransit service contracts?

II. Did the Metropolitan Council, in assuming all RTB responsibility, inherit the standards and guidelines of its predecessor?

III. Did the district court err in finding that the Metropolitan Council substantially complied with Minn.Stat. § 473.392?

IV. Was the district court's determination that Laidlaw substantially followed the requirements of the request for proposals contrary to the evidence in the record?

V. Did the district court's order fail to comply with the rules of civil procedure?

VI. Did the district court err in enjoining the Metropolitan Council from awarding further paratransit awards?

## ANALYSIS

■ On appeal from a bid protest, "the findings of the trial court are entitled to the same weight as a jury verdict and will not be disturbed on appeal unless they are manifestly contrary to the evidence and without reasonable evidentiary support." *Gale v. City of St. Paul*, 255 Minn. 108, 112, 96 N.W.2d 377, 380 (1959). This court, however, reviews questions of law de novo. *Am. Nat'l Gen. Ins. Co. v. Solum*, 641 N.W.2d 891, 895 (Minn.2002).

### I.

We begin by addressing the council's argument that the district court erred as a matter of law in holding that Minn.Stat. § 473.392 applies to the present procurement process. Section 473.392 provides that "the council may competitively bid transit services only in accordance with standards, procedures, and guidelines adopted by resolution of the council." Minn.Stat. § 473.392 (2002). The statute further mandates that the council develop these standards, procedures, and guidelines with the assistance of a project management team, which "must include representatives of the Amalgamated Transit Union Local 1005, private operators, local governments, and other persons interested in the subject." *Id.*

The council asserts that since section 473.392 requires a project management team consisting of union members and other parties uninvolved in paratransit services, the section "is clearly directed at competitive bidding for ... what would commonly be understood to be mass transit." Thus, it contends that Minn.Stat. § 473.386 (2002) alone should govern this contract; the services involved in this dispute are "special transportation services,"[2] and section 473.386 has its own standards and guidelines for special transportation service contracts.

We agree that Metro Mobility services are "special transportation services" as intended by section 473.386. But we disagree that competitive bidding for these services is governed solely by the rudimentary procurement guidelines provided in that section.

Section 473.386 provides that special transportation service contracts must "specify the service to be provided, the standards that must be met, and the rates for operating and providing special transportation services." Minn.Stat. § 473.386, subd. 2. The statute further requires the council to "contract with public, private, and private nonprofit providers that have demonstrated their ability to effectively provide service at a reasonable cost." *Id.*, subd. 3(a).

■ Though the council urges that these are the only standards that should apply for special transportation service contracts, we note that section 473.386 does not expressly address competitive procurement; section 473.392, on the other hand, clearly does. *See* Minn.Stat. § 645.26, subd. 1 (2002) (particular statutes control over general). Further, section 473.392 makes no distinction between "regular route transit" and "paratransit," but instead applies to *all* competitive bids for "transit service." Minn.Stat. § 473.392. "Transit" service, by statutory definition, includes both regular route service and paratransit service. Minn.Stat. § 174.22, subd. 7 (2002). The procurement guidelines adopted by the council (or its

---

**2.** "Special transportation service" is defined as "motor vehicle transportation provided on a regular basis by a public or private entity that is designed ... to serve individuals who are elderly, handicapped, or disabled and who are unable to use regular means of transportation...." Minn.Stat. § 174.29, subd. 1 (2002).

predecessors) would therefore apply equally to both.[3]

We do not adopt the council's assertion that section 473.392 is only directed at competitive bidding for mass transit. In our view, if the legislature intended the statute to apply only to regular route transit, it would have clearly expressed such intention. Because the statute instead expressly applies to all "transit," it applies here.

## II.

Having determined that Minn.Stat. § 473.392 applies, we turn next to the merits of Transit Team's arguments. Transit Team first challenges the district court's determination that the council followed Minn.Stat. § 473.392 by relying on the RTB's guidelines to solicit, evaluate, and award bids. It argues that section 473.392 was specifically created to require the council to adopt its *own* competitive bidding standards, rather than rely on those of the RTB, because "the system was broken . . . and the legislature was fixing it."

Chapter 628 of the 1994 Laws of Minnesota, which includes the amendments to section 473.392, provided sweeping changes to the landscape of metropolitan government. The power of several formerly autonomous agencies, the RTB included, was consolidated into a single entity: the Metropolitan Council. 1994 Minn. Laws, ch. 628, art. 2, § 4, subds. 1–3. The council, in turn, was given four new divisions: transportation, environment, community development, and administration. *Id.*, § 3, subd. 2.

Because of these separate divisions, the effects of the new law could not generally be felt in day-to-day operations; the new council divisions seamlessly assumed the duties, responsibilities, and activities of the former agencies. *See id.*, § 4. But the legislation was substantial nonetheless, for the changes placed a single entity (the council) under direct supervision of the governor, leading to less autonomy and greater accountability. *See id.*, art. 1, §§ 5, 6.

This historical perspective provides the context of our consideration of Transit Team's assertion that the legislature intended the council to adopt its own procurement procedures. Transit Team argues that the RTB was abolished, "at least in part, for leaving the seven-county agency paratransit service in a state of chaos and stranding disabled and elderly riders." Transit Team argues that because of the RTB's ineffective administration, the legislature specifically mandated that former RTB policy be abandoned. It points to the language of 1994 Minn. Laws, ch. 628, art. 2, § 4, subd. 1, which states that "[p]olicy with respect to [transportation] activities must be recommended by the transportation division committee of the metropolitan council to the full council," as well as the language of Minn.Stat. § 473.392, which states that competitive bids must be procured "only in accordance with standards, procedures, and guidelines adopted by resolution of the council," as evidence of the legislature's disdain for the RTB's internal policies.

We do not adopt Transit Team's assertions that chapter 628 was a direct reaction to the plight of stranded riders. Instead, as stated above, we conclude that the purpose of the changes in the statute was to consolidate and contain the authority of various metropolitan agencies. In fact, the language Transit Team relies on

---

**3.** The RTB standards in this case state that "[t]his policy will apply to *any* public transit services competitively awarded or funded through the Regional Transit Board." (Emphasis added.)

in subdivision 1 as indicative of the legislature's reaction to the alleged "chaos" at the RTB is identical to the language used in subdivisions 2 and 3 to abolish the Metropolitan Transit Commission and the Metropolitan Waste Control Commission. *Compare* 1994 Minn. Laws ch. 628, art. 2, § 4, subd. 2 ("Policy with respect to [Metropolitan Transit Commission] activities must be recommended by the transportation division committee of the metropolitan council to the full council."), *with id.,* subd. 3 ("Policy with respect to [Metropolitan Waste Control Commission] activities must be recommended by the environment division committee of the metropolitan council to the full council.") The language merely reflects the legislature's distribution of the council's new authority into its new divisions; it does not reflect the urgency and imminent catastrophe that Transit Team suggests.

■ Further, the changes made to section 473.392 also fail to reflect a legislative mandate to overhaul the bidding process. An examination of the 1994 amendment to the statute reveals that the *only* substantial changes made to that statute were the deletion of the reference to the "metropolitan transit authority" and the replacement of the words "regional transit board" and "board" with the word "council." 1994 Minn. Laws ch. 628, art. 3, § 96. These changes reflect the council's assumption of the RTB's authorities and activities.

Without a clear legislative mandate that the council was to abandon all prior RTB policies, the district court properly determined that "[f]or all purposes relevant to this case the council became the RTB and all RTB actions and policies became council actions and policies until further action by the council."

### III.

■ Transit Team next argues that, even if the council *could* follow previous RTB standards and still comply with Minn. Stat. § 473.492, it did not follow these standards when it issued its RFP. Further, Transit Team asserts that the council abandoned the evaluative guidelines established under the RFP once the evaluation process began. An evaluation of the record, however, reveals that the trial court properly held that the RFP substantially followed the standards and the evaluative process substantially adhered to the RFP.

### A. Compliance with RTB standards in issuing the request

■ The purpose of standards and guidelines for competitive bidding is to prevent such abuses as fraud, favoritism, extravagance, and improvidence, and to promote honesty, economy, and aboveboard dealing. *Coller v. City of St. Paul,* 223 Minn. 376, 387–88, 26 N.W.2d 835, 841 (1947). Set guidelines give all prospective contractors an equal opportunity to bid and to assure taxpayers of the best bargain for the least money. *See Nielsen v. City of St. Paul,* 252 Minn. 12, 20, 88 N.W.2d 853, 858 (1958). If the guidelines are substantially followed, minor defects in the procurement process will not be sufficient to void a contract into which the parties have already entered. *Telephone Assocs., Inc., v. St. Louis Cty. Bd.,* 364 N.W.2d 378, 382 (Minn.1985).

Here, after weighing the evidence from a five-day trial, the district court determined that the council's request for proposals complied with RTB standards. It found, after analyzing this evidence, that "nearly all of the relevant guidelines were followed in this case."

Reviewing the record, there is no reason to disturb the district court's finding. David Jacobson, the Metro Mobility general manager, testified that prior requests for proposals, based on the RTB stan-

dards, were used as "templates" for the current request. An exhibit proffered by the council offered a line-by-line comparison of the Metro Transit RFP to the adopted RTB guidelines. This comparison reveals that the council's request did not stray far from the guidelines, and that any deviation, in the words of the district court, is "form over substance."

### B. Compliance with RFP evaluative guidelines in awarding contract

The record also supports the district court's finding that the council properly weighed the evaluation criteria listed in the request for proposals. The counsel's transportation committee evaluated six companies' proposals under the RFP's criteria, and all six companies were found to be capable of doing the work. However, Laidlaw's proposal was unanimously selected because of numerous factors, including a new fleet, a strong staffing plan, best value for price, and company experience both locally and nationally. Though price was also an issue because of the considerable difference between the proposals by Laidlaw and Transit Team, it was not the exclusive factor, as Transit Team asserts. The record supports the court's conclusion that the evaluative process was not "turned on its head."

Transit Team asserts that the RFP guidelines should have allowed it an opportunity to match Laidlaw's proposed price. Though the record indicates that the council once approached Transit Team to negotiate a lower price on a previous proposal, the president of Transit Team concedes that this RFP contains no language mandating such an opportunity, and that most previous dealings with the council and RTB included no such negotiation. The closest language in the RFP provided that the council's evaluation team *may* request interviews or oral presentations. Such language does not create an obligation on the part of the council to renegotiate every proposal submitted. As such, because each bidder was given an equal opportunity to submit a proposal, Transit Team's assertion that the review process was somehow unfair is unsupported.

### IV.

Transit Team next contends that Laidlaw's proposal substantially varied from the requirements of the council's RFP, and that it was therefore the council's duty to reject the bid. Specifically, Transit Team points to Laidlaw's proposal being contingent on acceptance before March 15, 2003, and on fuel prices remaining below $1.40, as indicia of Laidlaw's failure to provide a set cost estimate. This failure, Transit Team asserts, is in direct violation of the RFP because the RFP expressly mandates a total dollar amount for vehicle costs and fuel.

A proposal must conform substantially to advertised plans and specifications, and where there is a substantial variance between the proposal and the plans and specifications, it is the plain duty of the public authority to reject the proposal. *Coller* 223 Minn. at 385, 26 N.W.2d at 840. A proposal containing immaterial variances or minor technical defects, however, should not be rejected if the defect does not affect the substance of the bid. *Otter Tail Power Co. v. Mackichan,* 270 Minn. 262, 275, 133 N.W.2d 511, 519 (1965). "The test of whether a variance is material is whether it gives a bidder a substantial advantage or benefit not enjoyed by other bidders." *Coller,* 223 Minn. at 385, 26 N.W.2d at 840.

Here the district court determined that the purported contingencies were not material variances because they did not affect the review or contracting actions taken by the council. First, the court

noted that the March deadline for Laidlaw's proposal merely reflected a price-guarantee deadline with one of Laidlaw's suppliers. Second, the court noted that though Laidlaw's bid may have had language concerning adjustments for increases in fuel costs, the final contract between the two parties failed to include such a reservation. The court determined that the language therefore did not affect the overall evaluation process.

The record supports the district court's interpretation of Laidlaw's proposal. Laidlaw, pursuant to its proposal, needed to purchase an entire fleet of new vehicles. To secure the prices for the new fleet, Laidlaw had to place its order by March 15, 2003. The price of the vehicles was therefore not unknown, as Transit Team implies, but instead was known and fixed until Laidlaw's vehicle price guarantees expired. This "contingency" therefore had no substantive effect on the overall bidding process.

With respect to gas prices, the record also supports the court's determination. The proposal's $1.40–per–gallon price was based upon the prices Laidlaw was then paying for fuel. With this base price, Laidlaw was able to set an overall price for fuel in accordance with the RFP requirements. And though the cover letter to the bid contained language reserving the right to seek an equitable adjustment, the final contract contained no such language. As the price quoted by Laidlaw in the RFP mirrored the final price of the contract, we fail to see how Laidlaw received a "substantial advantage or benefit," over other bidding.

Because the council's evaluation was based on a set price, proposed according to the RFP's requirements, we shall not disturb the district court's holding on this matter.

## V.

Transit Team next asserts that the district court's findings and conclusions fail to comply with Minn. R. Civ. P. 52. It contends that the court failed to "find the facts specially and state separately its conclusions of law thereon and direct the entry of the appropriate judgment" as required under the rule. An examination of the rule's advisory notes, however, reveals that we are not to interpret rule 52 as narrowly as Transit Team suggests.

The purpose of rule 52 is to aid the appellate court by affording it a clear understanding of the ground or basis of the trial court's decision. *Asch v. Housing & Redev. Auth. of St. Paul*, 256 Minn. 146, 155, 97 N.W.2d 656, 664–65 (1959). The rule prescribes no specific format, and expressly allows a written opinion or memorandum of decision to stand as findings of fact and conclusions of law. *See* Minn. R. Civ. P. 52.01, 1985 advisory comm. note. This written memorandum or opinion must include a separate statement of the facts, and explain the legal conclusions drawn therefrom. *Id.* "It is not necessary that the findings of fact be identified in separately numbered paragraphs or that the conclusions of law be similarly stated." *Id.*

Here, a two-page court order denied all of Transit Team's requests for relief, and enjoined the council from issuing any further paratransit service contracts. A ten-page memorandum, attached to and incorporated into the district court's order, provided a factual and procedural background, then provided analysis under the headings "standards, procedures and guidelines," "compliance," and "standing." It then specifically addressed Transit Team's arguments concerning compliance with Minn.Stat. § 473.392, and the council's evaluation process.

Considering the extensive analysis provided by the district court here, we are clearly provided with an understanding of the basis of the court's decision. As such, the district court adequately followed the guidelines set forth in Minn. R. Civ. P. 52.01, and its order will not be reversed on procedural grounds.

## VI.

We lastly address the propriety of the district court's injunction preventing the council from entering into further paratransit contracts until it adopts new standards, procedures, and guidelines pursuant to the process enunciated in Minn.Stat. § 473.392 (2002). Though we share the court's concerns regarding the inability of any single employee of the council to locate—let alone clearly articulate—the council's competitive procurement guidelines, we conclude that injunction is an unsuitable means to address these concerns.

■■■ The district court's decision to grant a temporary injunction will not be reversed absent a clear abuse of discretion. *Carl Bolander & Sons Co. v. City of Minneapolis,* 502 N.W.2d 203, 209 (Minn. 1993). Under this standard, a matter shall not be disturbed on appeal unless the district court abused its discretion, exercised its discretion in an arbitrary or capricious manner, or based its ruling on an erroneous view of the law. *Almor Corp. v. County of Hennepin,* 566 N.W.2d 696, 701 (Minn.1997).

Here, the district court determined that the RTB guidelines were still in effect at the time the council issued its request for proposals, and that the council adhered to these guidelines. Notwithstanding these determinations, the district court enjoined the council from entering into any further contracts until it revised the RTB guidelines. Its stated reason for the injunction is that "there is no department or person [within the council] that can put [the competitive procurement process] all together into a coherent whole."

■■■ We do not disturb the district court's finding that council employees were unaware of the policies and procedures for the competitive procurement of transit services; there is evidence within the record supporting this finding. However, in light of the district court's conclusion that proper guidelines are in place, we conclude that an injunction mandating the adoption of *new* guidelines is an inappropriate remedy. Because the *current* procurement procedures are effective, comport with Minn. Stat. § 473.493, and are already at the council's disposal, we conclude that the district court's injunction was an abuse of discretion.

## DECISION

The district court properly determined that Minn.Stat. § 473.392 (2002) applies to the competitive procurement of paratransit contracts, that the Metropolitan Council substantially complied with standards adopted by its predecessor, that those standards remain effective, and that Laidlaw substantially followed the procedures delineated in the Request for Proposal. We therefore affirm the district court's enforcement of the 2003–07 Metro Mobility contract. But because the court abused its discretion in enjoining the Metropolitan Council from issuing future paratransit service contracts, we reverse and dissolve the court's injunction.

**Affirmed in part and reversed in part.**