**Larry L. BYRD, et al., Appellants,**

v.

**INDEPENDENT SCHOOL DISTRICT NO. 194, Respondent.**

**No. C7–92–1510.**

Court of Appeals of Minnesota.

Feb. 2, 1993.

Review Denied April 20, 1993.

Stephen D. Gordon, A. Ray McCoy, Gordon–Miller–O'Brien, Minneapolis, for appellants.

James R. Andreen, Paul C. Ratwik, Ratwik, Roszak, Bergstrom & Maloney, P.A., Minneapolis, for respondent.

Considered and decided by PETERSON, P.J., and PARKER and SHORT, JJ.

## OPINION

PARKER, Judge.

Appellants Larry Byrd, James Hoiness, and the International Brotherhood of Electrical Workers (IBEW) argue the trial court erred in determining the IBEW lacked standing to pursue its claims. Appellants also argue Independent School District No. 194 violated the bid specifications, causing a material variance. In addition, they challenge the trial court's determination that their claims are barred by the doctrine of laches. Respondent Independent School District 194 (ISD 194) contends the court erred in determining appellants Byrd and Hoiness have standing as taxpayers. We affirm in part, reverse in part, and remand.

## FACTS

ISD 194, which includes the Lakeville area, has experienced rapid population growth in recent years. Anticipating an increase in high school enrollment, the taxpayers of ISD 194, in 1990, approved a $41,280,000 bond issue to finance construction of a new senior high school. The school is scheduled to open in the fall of 1993.

After approval of the bond issue, ISD 194 retained Wold Architect to prepare plans and bidding instructions. The school board of ISD 194 then published a solicitation for bids to construct the new high school. The published or written solicitation provided that early "sub-bids" for mechanical and electrical work must be submitted by October 15, 1991. Subcontractors who submitted bids for electrical work were required to provide bid bonds.

These sub-bids were to be used by prime contract bidders in formulating their bids, which were due October 17, 1991. The bidding instructions to the prime contractors provided in part:

> Single Prime Bidders are required to select from the posted list of mechanical and electrical subcontractor bids. Any subcontractor on the list can be selected. Failure to use mechanical or electrical subcontractors from the posted list in accordance with these procedures will be cause for rejection of bid.

Penn–Co Construction Company had been negotiating with Wright Electric to use Wright for the electrical work if Penn–Co were selected as the prime contractor. On October 15, 1991, Wright Electric notified Penn–Co that it would perform the electrical work on the Lakeville high school project for $2,453,520. Wright Electric, however, was unable to provide a bid bond and consequently could not bid for the electrical work in accordance with the bidding instructions. Despite the fact that Penn–Co was not a licensed electrical contractor, Penn–Co, using Wright's price quotation to formulate its bid, submitted a $2,907,600 bid to perform the electrical work on the Lakeville High School project. Electrical bids submitted to the school district included:

| | |
|---|---|
| SECO | $ 2,610,999 |
| Gephart | $ 2,799,500 |
| ERC | $ 2,696,000 |
| Bloomington Electric | $ 3,499,000 |
| Premier | $ 2,679,000 |
| Penn–Co | $ 2,907,600 |

Bids received from prime contractors included:

| | |
|---|---|
| PCL Construction | $21,373,000 |
| Kraus–Anderson Construction | $21,299,000 |
| Knutson Construction | $21,176,000 |
| M.A. Mortenson | $20,845,000 |
| Penn–Co Construction | $20,477,547 |

Penn–Co's prime bid had listed itself as the intended electrical subcontractor. After the prime bids were opened and after a review of Penn–Co's credentials, the architect determined that Penn–Co was not qualified to provide services as an electrical subcontractor. The project architect, Kevin Sullivan, notified Penn–Co of this determination.

Section 6.3.3 of the instructions to bidders provided:

Prior to the award of the Contract, the Architect will notify the Bidder in writing if either the Owner or Architect, after due investigation, has reasonable objection to a person or entity proposed by the Bidder. If the Owner or Architect has reasonable objection to a proposed person or entity, the Bidder may, at the Bidder's option, (1) withdraw the Bid, or (2) submit an acceptable substitute person or entity with an adjustment in the Base Bid or Alternate Bid to cover the difference in cost occasioned by such substitution. The Owner may accept the adjusted bid price or disqualify the Bidder.

Pursuant to the above provision, Penn–Co decided to withdraw its name as the electrical subcontractor on its prime bid and instead listed SECO as its electrical subcontractor. Penn–Co noted its use of SECO was necessarily "contingent upon agreement to a subcontract" with SECO. SECO was the lowest electrical subcontractor on the list, at $2,610,999 ($296,601 lower than Penn–Co's bid). Penn–Co, however, did not adjust its base bid to reflect the $296,601 savings resulting from substituting SECO for itself as the designated electrical contractor.

On October 22, 1991, ISD 194 awarded the prime contract to Penn–Co, the lowest bidder. Notice to proceed was given October 24, 1991, and Penn–Co immediately began constructing the new high school.

Penn–Co subsequently began negotiating with SECO Electric regarding the terms of an electrical subcontract for the project. While these negotiations were in progress, Penn–Co contracted with Wright Electric to provide temporary electrical work for the Lakeville project. During negotiations, Penn–Co insisted that SECO provide a performance bond. SECO also maintained its bid did not include temporary power and lighting requirements and requested an additional $107,000 to provide such services. On January 17, 1992, SECO withdrew its bid.

The architect then advised Penn–Co to offer the contract to three other bidders on the subcontract list: ERC, Inc.; Gephart Electric; and Premier Electric.[1] Penn–Co offered the electrical work to these companies, but insisted they perform all the work for $3,109,309.[2] Gephardt and Premier were willing to do the work, but only at the price specified in their respective bids.[3] They were not willing to perform the electrical work at SECO's bid price, which did not factor in a price for temporary electrical power.

At a special school board meeting on February 20, 1992, the school board granted Penn–Co's request to use an electrical subcontractor who had not previously submitted a bid, subject only to the project architect's approval. On February 24, 1992, Penn–Co entered into a subcontract agreement with Wright Electric. The total contract price was $3,005,520. The subcontract did not require Wright Electric to provide a performance bond.

---

**1.** All of these companies agreed that temporary power was a part of their electrical subcontract bid and noted the project specifications required the electrical subcontractor to provide such services.

**2.** This amount includes all electrical work and is higher than the subcontractors' base bids

shown earlier. The instructions required the subcontractors to submit base bids and also quotations on alternate plans the district was still considering.

**3.** Gephardt's quotation was $3,459,500 and Premier's was $3,261,000.

During the course of the bidding process and negotiations, the project architect, Kevin Sullivan, and Penn–Co's area manager, Denis Gagnon, maintained a seemingly close relationship. The following excerpts from Gagnon's notes reveal the atypical assistance Sullivan provided Penn–Co. Gagnon's notes of October 22, 1991, illustrate the extraordinarily close relationship between Penn–Co and Sullivan. Gagnon wrote:

Regarding the School Board Meeting tonight to award the project, Kevin felt that it would be best if I were not there. I asked Kevin if he would protect me if union issue[s] came up. He replied by saying that he has so far. I thanked him for that.

On January 7, 1992, Gagnon described a conversation he had with Sullivan regarding Penn–Co's interest in going off the authorized subcontractor list. Gagnon wrote:

I told Kevin [Sullivan] that David confirmed that we could go off the list. Kevin totally disagreed with this. Kevin is trying to protect Wold [architect] & the School Board interest. He said that he needs to build up his file on this issue.

On January 16, 1992, Gagnon wrote:

Of recent Kevin [Sullivan] was more talkative about the electrical issue, stating that we would all be better off if Wright does the job.

On February 18, 1992, Gagnon wrote:

Kevin [Sullivan] asked if we had signed a contract with Wright. I told him no. He alluded to the fact that it would maybe be a blessing if the contract was in place.

On February 18, 1992, Gagnon also wrote that he contacted Tom of Wright Electric and gave him an update on ISD 194's willingness to have Wright Electric do the job, and "Tom agreed to keep it quiet."

On March 13, 1992, appellants served their summons and complaint. In response to complaints of improper service, appellants served their summons and complaint again on April 14, 1992. The complaint sought a declaration that the prime general contract was void due to violations of the bidding statutes and requested temporary and permanent injunctive relief halting work on the high school.

Appellants' request for a temporary injunction was denied. Respondent subsequently moved for dismissal, and a hearing was held on May 12, 1992. In an order dated May 15, 1992, the court granted respondent's motion. The trial court, however, expressed concern over the suspicious circumstances surrounding the bidding process and contract award. It noted:

The questionable practice of Penn–Co submitting a bid for the electrical work based upon a quotation received from Wright at $500,000.00 more than the quotation; the failure of ISD 194 to insist upon a reduction in Penn–Co's bid price when SECO was substituted as the electrical contractor; the apparent extraordinary cooperation extended Penn–Co by Sullivan in connection with the designation of the electrical subcontractor before and after the general contract was awarded; and the eventual selection [of] Wright to perform the electrical work create suspicion and casts a cloud over the integrity of the process used in awarding the contract.

Appeal is from this order.

## ISSUES

I. Did the trial court err in determining that (a) IBEW does not have standing to bring its claims; and (b) appellants Byrd and Hoiness have standing as taxpayers?

II. Were bid specifications complied with and, if not, did a substantial variance occur?

III. Are appellants' claims barred by the doctrine of laches?

## DISCUSSION

### I

█ A person whose legitimate interest is "injured in fact" has standing to pursue a claim absent a discernible legislative intent to the contrary. *Snyder's Drug Stores, Inc. v. Minnesota State Bd. of Pharmacy*, 301 Minn. 28, 32, 221 N.W.2d

162, 165 (Minn.1974). Economic injury or the potential for economic injury may be sufficient to establish standing. *In re Application of Crown CoCo, Inc.*, 458 N.W.2d 132, 135 (Minn.App.1990). However, an organization's abstract concern with a subject which may be affected by an adjudication does not substitute for the injury-in-fact requirement. *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 40, 96 S.Ct. 1917, 1925, 48 L.Ed.2d 450 (1976).

■ A. Appellant IBEW argues the trial court incorrectly decided that it lacked standing to pursue its claims. The trial court reasoned that IBEW lacked standing because it failed to show any injury in fact.

IBEW contends that it meets the injury-in-fact requirement. Specifically, it argues:

> But for the sham negotiations Penn–Co conducted with SECO and the improper role of the architect, Kevin Sullivan, in assisting and protecting Penn–Co, IBEW members would have been employed to perform electrical work on the project.

There is no record evidence to support IBEW's position. There is no evidence indicating IBEW members would have received employment if Wright Electric did not perform the job. The only evidence IBEW cites in support of its argument is a letter from its business manager to a SECO employee, which provided:

> You can be assured that IBEW Local Union # 110 has every intention of providing the necessary manpower to complete the Lakeville School project on schedule. I will be available to assist you whenever needed.

The law requires a party to show injury in fact to establish standing. *See Snyder's*, 301 Minn. at 32, 221 N.W.2d at 165. There is no certainty IBEW members would receive work if ISD 194 were required to rebid the project or award the electrical work to another contractor from the bid list. IBEW's assertion to the contrary is speculative. Because IBEW's "injury" is speculative, we conclude IBEW lacks standing to pursue its claims. *See Simon*, 426 U.S. at 42–43, 96 S.Ct. at 1926 (indigents lacked standing to challenge va-

lidity of IRS regulations reducing amount of free medical care hospitals must provide in order to obtain tax benefits as a charity; court reasoned it was speculative whether a change in IRS regulations would decrease free medical services).

■ B. ISD 194 asserts appellants Byrd and Hoiness lack standing because they are motivated more by private gain than public good. We disagree. As the trial court noted, both Byrd and Hoiness are taxpayers in ISD 194. Taxpayers have a real and definite interest in preventing an illegal expenditure of tax money. *Arens v. Village of Rogers*, 240 Minn. 386, 392, 61 N.W.2d 508, 514 (1953). There is no case law indicating a taxpayer's motivation for bringing suit is relevant. Accordingly, we affirm the trial court's determination that Byrd and Hoiness have standing.

## II

The taxpayers maintain that allowing Penn–Co to go off the electrical subcontractor list violated the bidding instructions and constituted a substantial variance. Specifically, they contend ISD 194's bid instructions required prime contractors to select an electrical subcontractor from the list of those who submitted bids. Because Wright Electric was not on the electrical subcontractor list and it ultimately was selected to complete the project, the taxpayers reason that ISD 194 violated its bid instructions. This violation, they argue, constitutes a substantial variance. We agree.

■ Once a public authority adopts a competitive bidding method, the board is required, so long as that method was not seasonably abandoned, to pursue such method. *Griswold v. Ramsey County*, 242 Minn. 529, 535, 65 N.W.2d 647, 652 (1954). Public officials do not have authority to waive bidding defects which affect or destroy competitive bidding. *Telephone Assoc. v. St. Louis County Bd.*, 364 N.W.2d 378, 382 (Minn.1985). A board, however, may waive bid defects if public rights are not thereby prejudiced. *Id.* No material change may be made to the contract after

the contract has been awarded to the lowest bidder. *Griswold,* 242 Minn. at 536, 65 N.W.2d at 652.

The bidding instructions for the Lakeville High School project provided: [4]

Single Prime Bidders are required to select from the posted list of mechanical and electrical subcontractor bids. Any subcontractor on the list can be selected. Failure to use mechanical or electrical subcontractors from the posted list in accordance with these procedures will be cause for rejection of bid.

 Wright Electric was unable to provide a bid bond and consequently could not legitimately submit a bid as required by the bidding instructions. Penn–Co, however, added $454,080 to Wright's quotation and submitted a bid under its own name, despite its lack of a license as an electrical contractor. None of the other prime contractors was allowed to formulate its prime bid based on an unbonded subcontractor's price quotation. Penn–Co's use of an unbonded subcontractor's quotation constituted a variance from the bidding instructions. The question then becomes whether the variance was material. A variance is material if it gives a bidder a substantial advantage or benefit not enjoyed by other bidders. *Duffy v. Village of Princeton,* 240 Minn. 9, 12, 60 N.W.2d 27, 29 (1953). As explained below, we conclude that Penn–Co's use of Wright's price quotation gave Penn–Co an advantage over the other bidders.

Penn–Co was not qualified to perform the electrical work and should not have been on the list. However, by placing its name on the list, Penn–Co positioned itself to withdraw its bid if, upon opening, Penn–Co discovered its bid was too low compared to the other bidders and that it would lose money on the job. In short, Penn–Co's non-qualified electrical bid permitted it to avoid the consequences of any mistake it may have made, as Penn–Co always had the right, pursuant to section 6.3.3 of the bidding instructions, to withdraw the bid

once ISD 194 complained of its listed electrical subcontractor. This gave Penn–Co an advantage over the other prime contractors, who listed legitimate electrical subcontractors in their respective bids and therefore did not have this withdrawal option. *See Carl Bolander & Sons Co. v. City of Minneapolis,* 451 N.W.2d 204, 207–08 (Minn.1990) (where bidding documents specified that failure to submit information concerning commitment to contract with women-owned business enterprises would render bid nonresponsive, bidder's failure to specify women-owned business gave bidder advantage over others, in part, because bidder could "repent its bid and withdraw from the contract"). We conclude that Penn–Co had a substantial advantage over the other bidders, and consequently its bidding defects constituted a substantial variance from the bidding instructions.

 More fundamentally, we are concerned that the taxpayers did not receive the best bargain for the least money, which is clearly the purpose of competitive bidding. *See Griswold,* 242 Minn. at 535, 65 N.W.2d at 652. Section 6.3.3 of the instructions to bidders provided:

If the Owner or Architect has reasonable objection to a proposed person or entity, the Bidder may, at the Bidder's option, (1) withdraw the Bid, or (2) submit an acceptable substitute person or entity *with an adjustment in the Base Bid or Alternate Bid to cover the difference in cost occasioned by such substitution.*

(Emphasis supplied.)

After Penn–Co agreed to subcontract with SECO, Penn–Co failed to adjust its bid price to reflect the $296,601 savings it would have received by using SECO instead of Penn–Co. Likewise, when Penn–Co entered into the subcontract agreement with Wright Electric, there was no adjustment to the base bid as required by section 6.3.3. Nor was a sub-bid from Wright Electric ever presented to the school district. The district was not informed that

---

**4.** While not the most clearly drafted, this provision certainly contemplates the *use* of a subcontractor from the posted list.

Wright Electric had previously agreed to do the job for $552,000 less than the submitted subcontract price.

ISD 194 argues the "adjustment" provision was intended only to benefit the contractor. Specifically, it maintains the adjustment provision is triggered only when a new subcontract agreement would necessitate an increase in the base bid—not a decrease. We disagree. The plain language of section 6.3.3 provides the bidder may submit an acceptable substitute with "an adjustment in the Base Bid or Alternate Bid to cover the difference in cost occasioned by such substitution." Consequently, an adjustment should have been made to the base price to reflect *any* difference caused by a substitution. Penn–Co's failure to adjust its base price is a substantial bid defect which prejudices public rights. Accordingly, we hold that ISD 194's failure to enforce section 6.3.3 of the bidding instructions was a material variance. Moreover, given the aforementioned defects in the bidding process and contract award, we conclude ISD 194's tolerance of Penn–Co's circumvention of the district's announced bidding procedures constituted a material variance.

Finally, we share the trial court's concern with the architect's "assistance" to Penn–Co. The architect, who had the duty to enforce the bidding procedures, was notably less than diligent in representing the school board's interest. We agree that this extraordinary cooperation "casts a cloud over the integrity of the process used in awarding the contract."

### III

The purpose of laches is "to prevent one who has not been diligent in asserting a known right from recovering at the expense of one who has been prejudiced by the delay." *Klapmeier v. Town of Center,* 346 N.W.2d 133, 137 (Minn.1984) (quoting *Aronovitch v. Levy,* 238 Minn. 237, 242, 56 N.W.2d 570, 574 (1953)). In evaluating a laches claim, the basic question is "whether there has been such an unreasonable delay in asserting a known right, resulting in prejudice to others, as

would make it inequitable to grant the relief prayed for." *Klapmeier,* 346 N.W.2d at 137 (quoting *Fetsch v. Holm,* 236 Minn. 158, 163, 52 N.W.2d 113, 115 (1952)).

The trial court concluded the taxpayers' claims were barred by the doctrine of laches, noting:

The contract which is challenged by [taxpayers] was awarded on October 22, 1991. The work on the project has been progressing since October 1991 and is now between 16 and 25% completed depending on whether [taxpayers'] or [ISD 194's] calculation is accurate. * * * [Taxpayers] did not commence their actions until March 12, 1992, nearly 5 months after the project was commenced. The goal of [taxpayers'] actions is to force ISD 194 to rebid the project which will necessarily involve delay and expense and will have a substantial detrimental impact on the resources of the community and the educational needs of the children of Lakeville. Between October 1991 and March 1992 [taxpayers] attempted to promote their private gain by seeking participation in the LHS project. Only when [taxpayers] were unsuccessful in these attempts did they commence this action.

The taxpayers contend the trial court's laches determination was incorrect. Specifically, they contend the trial court used the wrong date to determine when their claim arose. The taxpayers maintain it was not until the school board authorized Penn–Co to go off the list on February 20, 1992, that their declaratory judgment action arose. We agree.

On January 17, 1992, SECO withdrew its bid and Penn–Co offered the contract to the other subcontractors on the authorized list. When no other subcontractor would perform the work at Penn–Co's asking price, the board decided to allow Penn–Co to go off the list. That decision was made February 20, 1992. Until that date, there was no reason to believe Penn–Co would not use an authorized subcontractor. While the school district had been tolerating a course of conduct which violated the bidding instructions, a material vari-

**234**

ance could have been avoided by using a subcontractor from the authorized list. Consequently, a declaratory judgment action brought before February 20, 1992, would have been premature. Although time was of the essence in this case, we conclude the three-week delay between February 20 and March 13, when the complaint was initially filed, was not unreasonable. We are thus compelled to reverse the trial court's determination that laches bars the taxpayers' claims.

## DECISION

Because we conclude the trial court erred by dismissing the taxpayers' claims, the complaint is ordered reinstated, and we remand to the trial court to formulate an appropriate remedy. The trial court should have the maximum latitude to fashion a remedy which is fair to the school district, the contractor, and the appellant taxpayers.

We recognize that construction on the Lakeville project has been underway since the trial court's estimate of completion. Therefore, vacation of the contract may no longer be practical or desirable. Various remedies have been suggested by the taxpayers, not all of which were before the trial court. The trial court should allow the record to be reopened and, if necessary, additional parties joined so that a proper remedy may be devised. Likewise, the court should allow the pleadings to be amended to give proper notice of proposed remedies.

Affirmed in part, reversed in part, and remanded.